**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Guy W. OLANO, Jr., Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Raymond M. GRAY, Defendant–Appellant.**

**Nos. 87–3128, 88–3096 and 88–3295.**

United States Court of Appeals, Ninth Circuit.

Aug. 9, 1995.

---

Guy W. Olano, Jr., Pensacola, FL, pro se.

John R. Muenster, Mestel & Muenster, Seattle, WA, William J. Genego, University of Southern California, Law Center, Los Angeles, CA, for defendant-appellant Raymond M. Gray.

Thomas C. Wales, Asst. U.S. Atty., Robert H. Westinghouse, Asst. U.S. Atty., Seattle, WA, for plaintiff-appellee.

Before: WRIGHT, REINHARDT, and O'SCANNLAIN, Circuit Judges.

Opinion by Judge O'SCANNLAIN; Dissent by Judge REINHARDT.

O'SCANNLAIN, Circuit Judge:

The Supreme Court having decided that the presence of alternate jurors during deliberations was not erroneous, we now decide, among myriad remaining issues, whether a juror's stipulated absence from a half-day of trial testimony is permissible.

## I

Olano and Gray participated in a complicated kickback scheme in which individuals abused their control of various financial institutions to grant unauthorized loans and extensions of credit to each other. The government brought various bank fraud charges against the two men in a multi-count indictment. A jury found Olano guilty of six counts of the indictment, and Gray guilty of eight.

On appeal, we reversed Olano's convictions under two of these counts, and Gray's convictions under three, for lack of sufficient evidence. *United States v. Olano*, 934 F.2d 1425, 1428 (9th Cir.1991) (*Olano I*). We also vacated both Olano's and Gray's convictions under all remaining counts for plain error because alternate jurors were present with the jury during deliberations. *Id.* The Supreme Court granted certiorari and reversed this portion of our decision, holding that permitting the presence of the alternate jurors did not constitute plain error. *United States v. Olano*, —— U.S. ——, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (*Olano II*).

On remand, we must address numerous arguments raised by Olano and Gray attacking the remaining convictions for which there was sufficient evidence.[1] Count I charged Olano and Gray with conspiracy to commit eight specific offenses against the United States in violation of 18 U.S.C. § 371. Count II charged Gray with wire fraud in violation of 18 U.S.C. § 1343. Count III charged Olano and Gray with interstate transportation of stolen property in violation of 18 U.S.C. § 2314. Count IV charged Olano and Gray with misapplication of funds in violation of 18 U.S.C. § 657. Count VIII charged Gray with making false statements in violation of 18 U.S.C. § 1006. Finally, count IX charged Olano with submitting false loan documents in violation of 18 U.S.C. § 1014.

Olano and Gray were tried with Davy Hilling, David Neubauer, among others.[2] These four men were directors and officers of financial institutions. Olano was chairman of the board of directors of Alliance Federal Savings and Loan Association of Kenner, Louisiana ("Alliance Federal"). He also had his own law office. Gray was chairman of the board of Home Savings and Loan Association in Seattle, Washington ("Home Savings"). Hilling was chairman of the board of Irving Savings Association in Irving, Texas ("Irving Savings"), and Neubauer was operations manager of I.C.R. Mortgage Bankers, Inc. ("ICR"), a wholly-owned subsidiary of Irving Savings.

The government asserts that these four individuals caused their institutions to transfer millions of dollars to each other through loans and letters of credit. According to the government, the defendants submitted false statements and bypassed generally-accepted procedural and record-keeping practices to ensure that these loans and issuances of credit were approved.

The precursor to the alleged conspiracy was Hilling and Neubauer's acquisition of the parent corporation of Irving Savings. This purchase, itself fraudulent, was heavily fi-

---

1. We declined to reach these arguments in our first opinion given our decision to reverse on the alternate jurors issue. *Olano I*, 934 F.2d at 1428 n. 3. Almost all of the claims of error are raised by Olano alone.

2. These other individuals were Stuart Kalterman, Brian Marler, and Joseph Ascani. Two other defendants, Jerome McCuin and Zaki Mansour, were tried separately.

nanced, and it encumbered Hilling and Neubauer with substantial debt.

Soon thereafter, the two men were introduced to Gray. Like Hilling and Neubauer, Gray wanted to purchase a number of business concerns but had little available cash or collateral to do so. The three men's mutual shortage of funds ultimately led them to cooperate in a scheme in which they caused the financial institutions that they controlled to lend each other money. Through undercollateralized loans and letters of credit issued out of Irving Savings, Hilling and Neubauer helped to fund Gray's acquisitions of, among other things, a portion of a startup airline and the Home Savings savings and loan. Gray, in turn, gave Hilling and Neubauer part of the proceeds from these loans and commitment letters to use for payments on their Irving Savings debt.

Olano shared Gray's, Hilling's and Neubauer's need for funds. Olano owned a condominium complex (the "Dauphine Condominiums") in Louisiana and was under pressure from creditors to pay off outstanding debt on the property. After meeting Gray, Olano found a potential buyer of the property—Jerome McCuin. McCuin, however, needed a loan to make the purchase. To help Olano, Gray caused Home Savings to issue an undercollateralized loan to McCuin. It is Olano's and Gray's fraudulent activity with respect to this loan that underlies the substantive counts for which they were convicted.

Federal investigations ultimately resulted in charges of a number of counts of bank-related fraud as well as participation in a single conspiracy. The jury found Olano and Gray guilty on counts that are described above as well as others which we have reversed in *Olano I*. The jury also returned guilty verdicts against Hilling and Neubauer on certain counts which convictions were later reversed in separate appeals. *See United States v. Hilling*, 891 F.2d 205 (9th Cir. 1988).

## II

Olano raises a number of trial procedure claims alleging violations of his Fifth and Sixth Amendment rights. We address each in its turn.

### A

On the twenty-eighth day of trial, juror Soleen became ill. The juror managed to sit through the morning session of testimony but informed the court that he could not continue through the afternoon. The district court notified counsel of this problem and hinted that Soleen could be replaced by an alternate juror. After conferring, the attorneys requested that Soleen be excused for the remainder of the day. They asked the court to check on Soleen the following morning to see if he had recovered. If he were well enough to attend the trial at that time, the attorneys suggested, the court could provide him with a transcript of the half-day's testimony that he missed.

The district court implemented this procedure after all counsel agreed to it. Soleen missed the afternoon examination of government witness Carole Lawrence, who had undergone direct examination in the morning, and a portion of government witness Kenneth Kuebel's testimony. On the next day, Soleen was well enough to continue sitting, and he ultimately was one of the jurors who returned verdicts against Olano and Gray.

Olano contends for the first time on appeal that Soleen's absence violated his Sixth Amendment right to trial by an impartial jury. According to Olano, the unbroken presence of all jurors during live testimony is inherent in this right. Since Soleen missed a portion of live testimony, Olano asserts that the district court committed reversible error.

### 1

Because Olano did not object to Soleen's absence at trial, we review for plain error. Fed.R.Crim.P. 52(b). The Supreme Court clarified the meaning of "plain error" review in its review of *Olano I*. According to the Court, a court of appeals has the authority to reverse a conviction under Federal Rule of Criminal Procedure 52(b) when (1) there was an error, (2) the error was plain, and (3) the error affected a defendant's substantial rights. *Olano II*, —— U.S. at ——–——,

113 S.Ct. at 1776–79. Even if each of these conditions is satisfied and an appellate court has the *authority* to reverse, it also retains the *discretion* whether to do so. A court of appeals "should not exercise that discretion unless [a plain error] seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at ——, 113 S.Ct. at 1776 (internal quotation omitted). Thus, more than plain error affecting substantive rights must exist for the court to reverse. *Id.* at ——, 113 S.Ct. at 1779.

**2**

We agree with Olano that the district court's decision to proceed without juror Soleen meets the first two requirements of Rule 52(b). An "error" under Rule 52(b) is any deviation from a legal rule, and an error is "plain" if it is " 'clear' or, equivalently, 'obvious.' " *Olano II,* —— U.S. at ——, 113 S.Ct. at 1779. The district court's decision to excuse Soleen for an afternoon meets these standards. The Federal Rules of Criminal Procedure nowhere authorize the novel tinkering with a jury that occurred in Olano's and Gray's trial. All involved should have known that they were operating outside of the range of options available for modifying the standard panel of twelve full-time jurors. *See* Fed.R.Crim.P. 23.

Whether the district court's error affected Olano's substantial rights presents a more difficult question. The Court stated in *Olano II* that an error affects a defendant's substantial rights when it prejudices him or her in such a manner that it "affect[s] the outcome of the District Court proceedings." —— U.S. at ——, 113 S.Ct. at 1779. In review for plain error, "[i]t is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *Id.* at ——, 113 S.Ct. at 1778.

Olano has not demonstrated actual prejudice from Soleen's absence. In particular, he has not demonstrated that Soleen did not read the transcripts of the testimony that he missed or that the demeanor of witnesses Lawrence and Kuebel was so dramatic that it was necessary for him to observe it firsthand.

In almost all cases, such a failure to demonstrate prejudice rings a death knell for a plain error claim. The Court indicated in *Olano II,* however, that some errors perhaps "should be presumed prejudicial if the defendant cannot make a specific showing of prejudice." *Id.* at ——, 113 S.Ct. at 1778.

We see no reason to presume prejudice from Soleen's absence. His absence was very brief: half a day's testimony out of a three-month trial. The testimony given during this time was not critical to the government's or the defense's case, and there is no indication that Lawrence's or Kuebel's demeanor was particularly remarkable. In addition, Soleen had been present during the majority of Lawrence's direct examination and had a limited opportunity to evaluate her demeanor. Soleen's absence thus had a negligible impact, if any, on his ability to evaluate the merits of the government's case against Olano.

**3**

Despite the absence of either actual or presumed prejudice, Olano's plain error claim still may prevail. The Court in *Olano II* explicitly refrained from deciding "whether the phrase 'affecting substantial rights' is *always* synonymous with 'prejudicial,' " *id.* (emphasis added), leaving the door open for the designation of some errors as per se violations of a defendant's substantial rights. Errors pertaining to "basic protections [without which] a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence" may fall into this class of per se plain error. *Id.* at ——, 113 S.Ct. at 1778.

This approach to plain error review is consistent with the framework in which appellate courts review harmless error under Federal Rule of Criminal Procedure 52(a). Under Rule 52(a), most error constitutes " 'trial error'—error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Arizona v. Fulminante,* 499 U.S. 279, 307–08, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991).

Some error is not susceptible to harmless error analysis and is per se prejudicial. Such error consists of "structural defects in the constitution of the trial mechanism." *Id.* at 309, 111 S.Ct. at 1265. Examples of structural defects are a biased judge, exclusion of grand jurors on the basis of race, violation of the right of self-representation at trial, and the right to public trial. *Id.* at 309–10, 111 S.Ct. at 1264–65. "Each of these constitutional deprivations is a similar structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Id.* at 310, 111 S.Ct. at 1265.

■ Consequently, we must consider whether Soleen's absence during trial qualifies as a structural defect in the trial mechanism. The answer to this question will depend on whether a criminal trial can "reliably serve its function as a vehicle for determination of guilt or innocence" when not every juror has observed every minute of the testimony of every witness at trial.

Our prior decisions indicate that it can. In *United States v. Springfield*, 829 F.2d 860 (9th Cir.1987), the district court discovered that a juror had slept through certain witness testimony. The defendant moved for a mistrial, which the court denied. On appeal, we affirmed the district court's denial of this motion as not an abuse of discretion, concluding that the defendant had "failed to demonstrate that the court's action deprived him of his right to an impartial jury and, more generally, to a fair trial." *Id.* at 864. *Accord United States v. McFarland*, 34 F.3d 1508 (9th Cir.1994) (substitution of alternate juror after deliberations have begun is not inherently prejudicial); *United States v. Krohn*, 560 F.2d 293, 297 (7th Cir.), *cert. denied*, 434 U.S. 895, 98 S.Ct. 275, 54 L.Ed.2d 182 (1977); *United States v. Curry*, 471 F.2d 419, 421–22 (5th Cir.), *cert. denied*, 411 U.S. 967, 93 S.Ct. 2150, 36 L.Ed.2d 688 (1973); *see also Tanner v. United States*, 483 U.S. 107, 126, 107 S.Ct. 2739, 2750–51, 97 L.Ed.2d 90 (1987) (jurors falling asleep during testimony are not incompetent).

*Springfield* holds that the presence of a sleeping juror during trial does not, per se, deprive a defendant of a fair trial. Cast another way, *Springfield* makes clear that the presence of all awake jurors throughout an entire trial is not an absolute prerequisite to a criminal trial's ability to "reliably serve its function as a vehicle for determination of guilt or innocence." A single juror's slumber thus is not per se plain error.

A juror who is physically absent during testimony is indistinguishable from a juror who is mentally absent because he or she is asleep. The basic problem is the same in both situations: the juror does not observe witness testimony. To the extent, then, that a sleeping juror does not constitute per se plain error, neither does an absent one.

The fact that Soleen reviewed the transcript of Lawrence's and Kuebel's testimony presents an even stronger case against finding plain error. Because Soleen was able to learn the substance of these witnesses' testimony, his absence deprived him only of the opportunity to assess their demeanor under cross-examination. Soleen's absence would have constituted error, then, only because he was limited to the substance of their testimony without the benefit of any "information" that he would have picked up from Lawrence's and Kuebel's trial demeanor.

Errors of this nature are not structural defects depriving a defendant of a fair trial. Instead, one instance of this sort of error is the quintessential form of trial error: hearsay. Hearsay is inadmissible because a juror's ability to evaluate a witness' testimony is greatly enhanced when he or she can consider the testimony in light of the declarant's demeanor. 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 800[01], at 800–11 (1993). Improper admission of hearsay is not a structural defect. When we conclude that a district court has wrongly admitted hearsay, we review for harmless error. *United States v. Payne*, 944 F.2d 1458, 1472 (9th Cir.1991), *cert. denied*, 503 U.S. 975, 112 S.Ct. 1598, 118 L.Ed.2d 313 (1992). Since Soleen's review of the Lawrence and Kuebel transcript presents a problem analogous to the improper admission of hearsay, there was no structural defect.

The district court's decision to proceed with testimony during Soleen's absence thus

was not plain error. Since there is no showing of actual or presumed prejudice, Soleen's temporary absence did not violate Olano's Sixth Amendment rights.[3]

### B

■■■ Olano contends that, on the sixth day of trial, the jury briefly witnessed him in handcuffs as he entered the courtroom. The government disputes this claim, arguing that Olano's handcuffs were removed prior to the time that he came into contact with jurors. A jury's view of a defendant while he or she is handcuffed implicates the defendant's Fifth Amendment right to due process. *Illinois v. Allen*, 397 U.S. 337, 345, 90 S.Ct. 1057, 1061–62, 25 L.Ed.2d 353 (1970); *Jones v. Meyer*, 899 F.2d 883, 884 (9th Cir.), *cert. denied*, 498 U.S. 832, 111 S.Ct. 95, 112 L.Ed.2d 67 (1990).

The district court held an evidentiary hearing because of this alleged incident. It concluded that no jurors had witnessed Olano in handcuffs, and decided that there was no need to issue a cautionary instruction.

■■■ We will uphold a district court's factual findings unless there is clear error. *United States v. Oba*, 978 F.2d 1123, 1125 (9th Cir.1992). Olano cites to no facts in the record indicating that the district judge's finding was erroneous. Further, the guard who had escorted Olano testified that she removed Olano's handcuffs prior to the time they exited the elevator. There was no clear error.

■■■ The district court also concluded that Olano had suffered no prejudice even if some

jurors had seen Olano's handcuffs. We agree. Because a jury's brief or inadvertent glimpse of a defendant in physical restraints is not inherently or presumptively prejudicial to a defendant, *Wilson v. McCarthy*, 770 F.2d 1482, 1485–86 (9th Cir.1985), Olano must demonstrate actual prejudice to establish a constitutional violation. *United States v. Halliburton*, 870 F.2d 557, 560–61 (9th Cir.), *cert. denied*, 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 575 (1989). Olano did not examine the jury and has adduced no other evidence probative of prejudice. He has failed to establish actual prejudice.[4]

### C

Olano objects to two ex parte meetings that the district judge held during trial—one with a juror and the other with a security guard.

### 1

■■ The first meeting concerned juror Mildred Logan, who had sent a note to the judge stating that her daughter-in-law recently had accepted a job with Home Savings. The district judge told counsel for all parties about the note and asked if they would like her to speak "one on one" with Logan in chambers. Counsel for one codefendant and the prosecution assented, and the remaining attorneys, including Olano's, did not object. Olano now complains that the judge's ex parte meeting with juror Logan violated the Fifth Amendment guarantee of due process, the Sixth Amendment right of confrontation, and Federal Rule of Criminal Procedure 43.

---

3. Olano raises two other objections regarding the designation of alternate jurors and the selection of the jury pool. First, he contends that the district court improperly failed to designate the alternate jurors prior to trial but, instead, waited until the jury was to begin deliberations, at which time the parties designated the alternates. In *United States v. Aguon*, 851 F.2d 1158, 1171 (9th Cir.1988) (en banc), we upheld a nearly identical procedure. We stated that, "[a]bsent the consent of the parties, we discourage this unauthorized deviation from standard procedure." *Id.* However, we held that the error was harmless because the defendant had presented no scenario in which he could have been prejudiced. The same is true in the instant case, and

we see no way in which Olano was more likely to suffer prejudice than the defendant in *Aguon*.

Second, Olano contends that the district court committed plain error when it gave questionnaires to members of the prospective jury pool asking them if they could be available for a long trial. Since Olano has not demonstrated any actual prejudice arising from this alleged error, nor explained why this would be a structural error preventing him from receiving a fair trial, there can be no plain error.

4. Olano also contends that some jurors saw him in leg shackles, handcuffs and a belly chain outside of the courthouse on several occasions. The record offers no support of this assertion.

His claim is foreclosed by *United States v. Gagnon*, 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985). There, the Court considered a very similar ex parte in camera meeting between a district judge and a juror in which the juror was questioned about his impartiality. The Court rejected the argument that this meeting contravened the Constitution, stating:

> The mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has no constitutional right to be present at every interaction between a judge and a juror. . . .

*Id.* at 526, 105 S.Ct. at 1484. The district judge's meeting with juror Logan is indistinguishable from the meeting in *Gagnon*. Olano fails to establish a constitutional violation under either the Fifth or Sixth Amendment.

■ The *Gagnon* Court also rejected the defendant's Rule 43 claim because he had failed to object to the ex parte meeting. According to the Court, "failure by a criminal defendant to invoke his right to be present under ... Rule ... 43 at a conference which he knows is taking place between a judge and juror in chambers constitutes a valid waiver of that right." *Id.* at 529, 105 S.Ct. at 1486. Since Olano also failed to object, he too waived his right to appeal on the basis of Rule 43. *United States v. McClendon*, 782 F.2d 785, 788–89 (9th Cir.1986).

2

The second meeting involved security officer Sheila Pearce, the guard who escorted Olano at the time he purportedly was exposed to the jury while in handcuffs. Prior to the evidentiary hearing on this incident, the district judge interviewed Pearce in camera without prior notice to counsel. Olano asserts that this meeting violated Rule 43 and the Due Process Clause.

■ We disagree. Rule 43 provides that a defendant has a right to be present at "every stage of the trial." Fed.R.Crim.P. 43(a). Where a judge acts in his or her administrative capacity to ensure that a trial is fair, these events are not "stages" of a trial. *See LaChappelle v. Moran*, 699 F.2d 560, 565 (1st Cir.1983) (in camera conference not a "stage" of trial where "judge sought to exercise his extraordinary powers to administer the trial in a just manner"). In *United States v. Dischner*, 974 F.2d 1502 (9th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1290, 122 L.Ed.2d 682 (1993), a juror's physician informed the court clerk that the juror had broken her shoulder and may have crushed her shoulder socket. The clerk gave this information to the district judge, who, in turn, relayed it to the parties in open court. When the judge subsequently excused the injured juror, the defendant objected that he had not been present when the clerk communicated with the district judge. We rejected that claim, holding that:

> The time when the clerk relays information to the judge in chambers is not a "stage" of the trial at which Fed.R.Crim.P. 43 requires the defendant to be present. No court proceeding took place, no decision was rendered, and [the defendant] was denied no opportunity to be heard. When the district court ruled, it ruled in open court and on the record after informing the parties of the facts it had learned, which [the defendant] conceded were accurate, and after considering arguments from all parties. The record for appeal was adequately developed, and both sides were present when the district court rendered its decision and explained its basis.

*Id.* at 1513–14.

As in *Dischner*, the district judge's in camera meeting with the security officer was a proper administrative act taken to maintain the fairness of Olano's trial: the meeting served to ensure that security procedures were corrected to avoid possible future improper exposure of Olano to the jury. The judge did not decide during this meeting whether jurors saw Olano in handcuffs but, instead, based her decision on the testimony adduced at the evidentiary hearing. Olano examined officer Pearce at this hearing, and the parties had an opportunity to present their positions to the court. The district court thus did not violate Rule 43.

Nor did it deprive Olano of due process. "[T]he presence of a defendant is a condition

of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Gagnon,* 470 U.S. at 526, 105 S.Ct. at 1484. (internal quotation omitted); *see United States v. McCoy,* 8 F.3d 495, 497 (7th Cir.1993).

We do not believe that the judge's ex parte meeting deprived Olano of a fair trial. Olano examined Pearce and other witnesses at the mistrial hearing, and the district judge rendered her decision after considering witness testimony. *See United States v. Shukitis,* 877 F.2d 1322, 1330 (7th Cir.1989); *LaChappelle,* 699 F.2d at 567. The court also indicated that officer Pearce's testimony was consistent with the statements Pearce made during the in camera meeting. These facts, as well as the fact that the meeting was a proper administrative act, make it clear that Olano's ability to defend himself was not compromised.

### D

██ On the twentieth day of trial, juror Wesley Martin encountered codefendant Neubauer and his wife as he left a courthouse elevator. Mrs. Neubauer asked the juror if his name was Wesley Martin, and he answered that it was. She then mentioned that she had a brother by the same name who worked at a local aircraft company. The juror acknowledged that, although he had never met this other Wesley Martin, their mail occasionally was mixed up.

When the district court and the parties became aware of this conversation, the district court re-admonished the jury not to speak with the parties. No party moved for a mistrial. Olano nevertheless now asserts that the district court should have entertained a motion for mistrial sua sponte.[5]

"In general, the standard of review for a trial court's decisions regarding jury incidents is abuse of discretion." *United States v. Soulard,* 730 F.2d 1292, 1305 (9th Cir. 1984). "A trial court has considerable discretion in determining whether to hold an investigative hearing on allegations of jury misconduct or bias and in defining its nature and

extent." *Id.* "Our review ultimately is limited to determining whether the District Court, in view of all the circumstances, so abused its discretion that [the defendant] must be deemed to have been deprived of his Fifth Amendment due-process or Sixth Amendment impartial-jury guarantees." *Id.*

The district court did not abuse its discretion in not entertaining sua sponte a motion for mistrial. Juror Martin's conversation with Mrs. Neubauer was brief, and it did not relate to the trial. While not appropriate, it did not constitute grounds for mistrial. *Id.* at 1305–06 (failure to declare mistrial not abuse of discretion where juror contact was brief and unrelated to trial).

### E

██ Olano claims that the employment of juror Logan's daughter-in-law at Home Savings biased Logan against him. "It is well-settled that a single partial juror deprives a defendant of his Sixth Amendment right to a trial by an impartial jury." *United States v. Plache,* 913 F.2d 1375, 1377 (9th Cir.1990). Because Olano did not move for mistrial on this issue, we review for plain error. *United States v. Ross,* 886 F.2d 264, 266 (9th Cir. 1989), *cert. denied,* 494 U.S. 1083, 110 S.Ct. 1818, 108 L.Ed.2d 947 (1990).

Olano has not adduced specific facts evidencing an actual bias by Logan against him. Further, we see no reason to presume bias because of the daughter-in-law's employment. "[O]nly in extreme or extraordinary cases should bias be presumed." *Plache,* 913 F.2d at 1378 (internal quotations omitted). Courts generally have "declined to find implied bias from a juror's employment alone even where closely related to the substance of the case." *Tinsley v. Borg,* 895 F.2d 520, 529 (9th Cir.1990), *cert. denied,* 498 U.S. 1091, 111 S.Ct. 974, 112 L.Ed.2d 1059 (1991); *see, e.g., Plache,* 913 F.2d at 1378. Since Logan herself was not employed by Home Savings, it is even less likely that she was biased against Olano by virtue of her daughter-in-law's job. The district court thus did

---

5. Although we are unsure how Mrs. Neubauer's contact with juror Martin could prejudice Olano, our rejection of Olano's claim on other grounds renders consideration of this point unnecessary.

not commit plain error in proceeding with the trial.

### F

■ During a brief trial recess, attorneys spoke with the district judge about an upcoming news report on bank fraud, Mrs. Neubauer's contact with juror Martin, and a few issues regarding trial procedure. The record indicates that Olano's counsel arrived late at some point during this conference.

Olano contends that the district court's holding of the conference in the absence of his attorney violated his Sixth Amendment right to counsel. Citing *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), Olano contends that his counsel was absent at a "critical" point in his trial, a fact requiring reversal. In *Cronic*, the Supreme Court indicated that an attorney's representation could be presumed ineffective under the Sixth Amendment if, by failing to appear at a critical stage of a trial or otherwise, he or she failed to subject the prosecution's case to adversarial testing. *Id.* at 659, 104 S.Ct. at 2047; *see also United States v. Swanson*, 943 F.2d 1070 (9th Cir. 1991).

To establish a violation under *Cronic*, an appellant must demonstrate that he or she suffered the equivalent of a complete absence of counsel. *Harding v. Lewis*, 834 F.2d 853, 859 (9th Cir.1987), *cert. denied*, 488 U.S. 871, 109 S.Ct. 182, 102 L.Ed.2d 151 (1988). Olano has not met this standard. The record is unclear as to how late Olano's counsel was for the conference. Since we do not know if he missed two minutes or twenty, Olano has not shown that his attorney was absent during any crucial discussions. Further, because the matters discussed were minor, the conference was not a "critical" phase of the trial. We thus reject Olano's claim.

### G

■ Olano asserts that the district court violated his Sixth Amendment right to counsel when it denied his motion to participate in the trial as co-counsel alongside his appointed counsel. A defendant has the right to represent himself or herself pro se or to be represented by an attorney. *United States v. Halbert*, 640 F.2d 1000, 1009 (9th Cir.1981) (per curiam). However, a "defendant does not have a constitutional right to 'hybrid' representation" at trial. *United States v. Kienenberger*, 13 F.3d 1354, 1356 (9th Cir.1994). He or she therefore has no absolute right to serve as co-counsel after electing to be represented by an attorney. *United States v. Williams*, 791 F.2d 1383, 1389 (9th Cir.), *cert. denied*, 479 U.S. 869, 107 S.Ct. 233, 93 L.Ed.2d 159 (1986). Although the district court has the authority to permit hybrid representation, we review its decision not to do so for abuse of discretion. *Halbert*, 640 F.2d at 1009.

The district court did not abuse its discretion in denying Olano's motion to serve as co-counsel. Olano wanted to represent himself during certain portions of the trial because he allegedly had more expertise in banking and real estate law than did his appointed counsel. Olano has not demonstrated, however, why he could not have provided his attorney with the benefit of this expertise prior to or during trial, without himself acting as co-counsel. *See, e.g., Duke v. United States*, 255 F.2d 721, 726 (9th Cir.) (defendant represented by attorney has no right to make opening statement where he could assist his attorney prior to trial), *cert. denied*, 357 U.S. 920, 78 S.Ct. 1361, 2 L.Ed.2d 1365 (1958). He thus has not established any "special need" requiring the district court to permit him to participate at trial. *See United States v. Condo*, 741 F.2d 238, 239 (9th Cir.1984), *cert. denied*, 469 U.S. 1164, 105 S.Ct. 924, 83 L.Ed.2d 936 (1985) (per curiam).

### H

Both Olano and Gray assert that the prosecution's evidence at trial under count I created a prejudicial variance from the single conspiracy charged in the indictment. According to Olano and Gray, the government's evidence at best established the existence of multiple, distinct conspiracies, rather than a single overall conspiracy.

■ "Under the grand jury clause of the fifth amendment, a defendant has a right to

be tried only on the grand jury's indictment." *United States v. Olson,* 925 F.2d 1170, 1175 (9th Cir.1991). "This requirement serves the notice-related functions of protecting against unfair surprise, enabling the defendant to prepare for trial and permitting the defendant to plead the indictment as a bar to later prosecutions. Requiring the proof to remain true to the indictment enables the grand jury to serve its function of protecting the citizenry." *Id.* (citation omitted). A variance occurs when the evidence offered at trial proves facts that are materially different from those alleged in the indictment. *United States v. Von Stoll,* 726 F.2d 584, 586 (9th Cir.1984).

**1**

■ Olano and Gray assert that Hilling's and Neubauer's fraudulent acquisition of Irving Savings constituted a separate and distinct conspiracy. Since the government put on a number of witnesses and exhibits to explain this acquisition, Olano and Gray argue that the evidence at trial proved multiple conspiracies.

Olano and Gray misapprehend the government's purpose for introducing evidence of the acquisition of Irving Savings. The government did not seek to prove that the acquisition of Irving Savings was part of the conspiracy involving Hilling, Neubauer, Gray, and eventually Olano. Instead, it introduced this evidence in order to explain why Hilling and Neubauer entered into their subsequent conspiracy with Gray and Olano: the two men needed immediate cash to service their debt. As an explanatory background to the conspiracy the evidence properly was admitted. *See, e.g., United States v. Foster,* 985 F.2d 466, 469 (9th Cir.1993) (evidence of defendant's arrest admissible "because it showed the background and development of ... conspiracy").

**2**

■ In a related argument, Olano and Gray assert that the government failed to adduce any evidence linking Olano to Hilling's and Neubauer's fraudulent transactions with Gray.

Olano and Gray misconceive the nature of the evidence that the government must produce to link their conspiracy with Hilling and Neubauer. "Once a conspiracy is established, evidence of only a slight connection with it is sufficient to establish a defendant's participation in it." *United States v. Castaneda,* 16 F.3d 1504, 1510 (9th Cir.1994). "Connection to a conspiracy may be inferred from circumstantial evidence." *Foster,* 985 F.2d at 469. Even seemingly innocent acts, "when viewed in context, may support an inference of guilt." *United States v. Mares,* 940 F.2d 455, 458 (9th Cir.1991).

The government proved a sufficient nexus between Olano and Hilling's and Neubauer's conspiracy with Gray. In spring of 1984, Hilling and Neubauer negotiated with Michael Speaks to issue a $4 million letter of commitment for a casino project in Las Vegas, Nevada. Hilling and Neubauer were the only people at Irving Savings aware of this letter, and they backdated it to avoid regulatory scrutiny. However, Hilling and Neubauer later informed Speaks that it could not fulfill the $4 million commitment because of regulatory activity. They spoke with Gray, who obtained the assistance of Olano. Olano orchestrated a short-term bridge loan from Alliance Federal to Speaks. Gray later arranged for Home Savings to assume this loan.

■ This evidence demonstrates an interdependent relationship between the fraudulent activities of Olano, Gray, Hilling, and Neubauer, thus establishing a "slight connection" between Olano and the Hilling–Neubauer–Gray conspiracy. *See United States v. Restrepo,* 930 F.2d 705, 711 (9th Cir.1991) (connection to conspiracy established by defendant's acts furthering coconspirators' objective); *United States v. Miller,* 895 F.2d 1431, 1440 (D.C.Cir.) (connection established by interdependence of defendants), *cert. denied,* 498 U.S. 825, 111 S.Ct. 79, 112 L.Ed.2d 52 (1990).[6]

---

6. We note that, even if Olano and Gray had established a variance, the error was cured by the district court's instruction to the jury that it

could convict a defendant only if it found that he was a member of the conspiracy charged in the indictment, regardless of whether the jury be-

We conclude that there was no variance from the indictment.

## I

Olano asserts that the district court erred in not severing his trial from that of his codefendants. Prior to trial, the district court denied his motion to sever, brought pursuant to Federal Rule of Criminal Procedure 14.

■ We review the district court's decision for abuse of discretion. *United States v. Sitton*, 968 F.2d 947, 961 (9th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1306, 122 L.Ed.2d 695 (1993). A district court abuses its discretion in denying a Rule 14 motion only if an appellant demonstrates clear, manifest or undue prejudice establishing that he or she was denied a fair trial. *United States v. Catabran*, 836 F.2d 453, 460 (9th Cir.1988); *United States v. Escalante*, 637 F.2d 1197, 1201 (9th Cir.), *cert. denied*, 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980).

Olano attempts to show prejudice in three ways. First, he contends that testimony introduced against Hilling, Neubauer, and Gray regarding the acquisition of Irving Savings was inadmissible against him and, thus, would not have been admitted had his trial been severed. For the reasons expressed above in part II–H, this argument is without merit.

■ Second, Olano claims that Hilling would have testified on his behalf had his trial been severed. Olano offers no evidence to support this bald claim. "When the reason for severance is the need for a codefendant's testimony, [a] defendant must show that he would call the codefendant at a severed trial, that the codefendant would in fact testify, and that the testimony would be favorable." *United States v. Jenkins*, 785 F.2d 1387, 1393 (9th Cir.), *cert. denied*, 479 U.S. 855, 107 S.Ct. 192, 93 L.Ed.2d 125 (1986). Olano has made no showing that Hilling would have testified at a severed trial.

■ Third, Olano claims that the admission of hearsay statements made by nontestifying codefendants compromised his Sixth Amendment right of confrontation. "The right of confrontation includes the right to cross-examine witnesses. Therefore, where two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand." *Richardson v. Marsh*, 481 U.S. 200, 206, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987) (citation omitted).

Adhering to this rule, the district court admitted hearsay statements made by Hilling, Marler, and Gray against only those defendants and issued a limiting instruction directing the jury not to consider the statements as evidence against other defendants. Citing *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), Olano asserts that these precautions were insufficient to protect his Confrontation Clause rights. "In *Bruton*, the Supreme Court held that the introduction of a nontestifying codefendant's confession violates a defendant's Sixth Amendment right of confrontation, even if the judge instructs the jury that the confession is admissible only against the nontestifying codefendant." *United States v. Hoac*, 990 F.2d 1099, 1105 (9th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1075, 127 L.Ed.2d 392 (1994). However, in *Richardson*, 481 U.S. 200, 107 S.Ct. 1702, the Supreme Court "limited *Bruton* to confessions that are facially incriminating." *Hoac*, 990 F.2d at 1105.

None of the codefendants' statements incriminated Olano on their face. Unlike the full-blown confession that was the subject of *Bruton*, the grand jury and deposition testimony of Hilling, Marler, and Gray that was read to the jury plainly did not have a sufficiently "devastating" or "powerful" inculpatory impact to be incriminatory on its face. *See United States v. Wright*, 742 F.2d 1215, 1223 (9th Cir.1984) (letter did not violate *Bruton* because it was not "powerfully incriminating"); *United States v. O'Connor*, 737 F.2d 814, 820 (9th Cir.1984) (conversation

lieved that the defendant was part of some other conspiracy. *United States v. Miller*, 771 F.2d

1219, 1240 (9th Cir.1985).

lacked " 'powerfully incriminating' or 'devastating' impact required for *Bruton* violation"), *cert. denied,* 469 U.S. 1218, 105 S.Ct. 1198, 84 L.Ed.2d 343 (1985). The same is true for Gray's oral statement that he had "two loans for Guy Olano to make." Consequently, Olano has not established a violation of his confrontation rights under *Bruton.*

The district court did not abuse its discretion in not severing Olano's trial.

### J

■ Olano asserts that his Fifth Amendment right not to testify was compromised on three occasions by comments on his silence at trial. "The Fifth Amendment protects a criminal defendant from being required to give incriminating testimony." *Foster,* 985 F.2d at 468. A comment on a defendant's failure to testify warrants reversal if the commentary is extensive, an inference of guilt from silence is stressed to the jury as a basis for the conviction, and there is evidence that would have supported an acquittal. *Jeffries v. Blodgett,* 5 F.3d 1180, 1192 (9th Cir. 1993), *cert. denied,* — U.S. —, 114 S.Ct. 1294, 127 L.Ed.2d 647 (1994); *United States v. Kennedy,* 714 F.2d 968, 976 (9th Cir.1983), *cert. denied,* 465 U.S. 1034, 104 S.Ct. 1305, 79 L.Ed.2d 704 (1984). We apply this standard to each of the incidents of which Olano complains.

### 1

The prosecution asked a witness whether a related civil lawsuit in which he was suing Olano's codefendants had been postponed. Drawing an objection, the witness responded, "[t]hat's correct. These gentlemen here took the fifth and they would not testify, so the judge said, '[w]e'll just wait until their trial is over then.' " Olano contends that this remark commented on his right to remain silent.

He is incorrect. The record makes clear that the witness' reference to "[t]hese gentlemen" was to codefendants Hilling, Gray, and Neubauer, whom the witness earlier had said he was suing in the civil proceeding, and not to Olano. The remark thus was not a comment on Olano's decision not to testify.

### 2

The government said in closing argument that the jury had "yet to hear from any members of the law offices of Guy W. Olano who testified at this trial that there was ever a bill as large as a 50 thousand dollar bill sent out from the law office separate and apart [from] . . . any settlement statement." Olano construes this statement as a comment on his silence. We review this claim for plain error because Olano did not object at trial. *United States v. Tarazon,* 989 F.2d 1045, 1051 (9th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 155, 126 L.Ed.2d 116 (1993).

We again disagree with Olano's reading of the allegedly improper statement. The prosecutor's remark commented only on the failure of defense witnesses to provide certain testimony, not on Olano's failure to testify on his own behalf. This was not improper, *see United States v. Castillo,* 866 F.2d 1071, 1083 (9th Cir.1988), and thus was not plain error.

### 3

■ Stuart Kalterman's attorney emphasized in closing argument that his client had testified at trial. He stated:

> Her Honor has already told you under our marvelous Constitution one doesn't have to testify in his own defense, no comment can be made. I don't know that I'd testify in my defense on any charge, but one doesn't even have to present a defense. The burden is on [the government to prove guilt] beyond a reasonable doubt, but Mr. Kalterman sat up in that chair for almost 20 hours and let everybody take a shot at him.

Because Olano failed to object, we review for plain error.

The attorney's closing argument touched upon Olano's failure to testify by negative implication. The attorney's statements implicated Olano's refusal to testify only indirectly. Further, jurors already had received a cautionary instruction requiring them not to draw a negative inference from a defendant's decision not to testify. Given these circumstances, the attorney's statement did not amount to plain error. *See United States*

*v. Patterson,* 819 F.2d 1495, 1506 (9th Cir. 1987); *United States v. Moreno–Nunez,* 595 F.2d 1186, 1187 (9th Cir.1979).

### K

 Olano asserts that he was deprived of due process because government witness John Lapaglia perjured himself at trial. During recross-examination, Lapaglia denied taking an Alliance Federal letter of credit to Reno, Nevada and denied that Gray owed him a fee for obtaining the letter of credit. The prosecution believed that Lapaglia's denials were untrue and confronted Lapaglia during redirect examination with a $22,500 check payable to him by Alliance Federal. The check stated on its face: "Brokerage fee, letter of credit, Raymond Gray," and bore a date soon after Lapaglia's trip to Reno. Despite this inconsistent evidence, Lapaglia again denied that he had handled the Alliance Federal letter of credit. In closing argument, the government conceded that Lapaglia had lied about the letter of credit and suggested to the jury that it should disregard Lapaglia's entire testimony except to the extent that it had been corroborated.

"There exists a constitutional obligation on prosecutors to report to the defendant and to the court whenever government witnesses lie under oath." *United States v. Endicott,* 869 F.2d 452, 456 (9th Cir.1989). However, "[a] prosecutor can never guarantee that a witness will not commit perjury. Her duty is to refrain from knowingly presenting perjured testimony and from knowingly failing to disclose that testimony used to convict a defendant was false." *United States v. Aichele,* 941 F.2d 761, 766 (9th Cir.1991).

The government did not violate these obligations. It did not elicit Lapaglia's allegedly perjurious testimony, which came out during the defense's recross-examination. *Id.* It also immediately confronted Lapaglia with the $22,500 check, permitting defense counsel to impeach him on further recross-examination. *See United States v. Shaw,* 829 F.2d 714, 718 (9th Cir.1987), *cert. denied,* 485 U.S. 1022, 108 S.Ct. 1577, 99 L.Ed.2d 892 (1988). Finally, the prosecution later conceded to the

jury that Lapaglia had perjured himself. The government's prompt and clear repudiation of Lapaglia's alleged perjury nullifies Olano's assignment of error.

### L

 Olano contends that counts II and III charged the same crimes. We disagree. The criminal statute underlying count II is 18 U.S.C. § 1343, which prohibits the use of a wire, radio or television to execute a fraudulent scheme. The statute underlying count III is 18 U.S.C. § 2314, which forbids the knowing interstate transportation of goods that have been stolen, converted or taken by fraud. The statutes forbid different types of conduct and require the government to prove different sets of facts. Counts II and III thus did not charge the same crimes. *United States v. Wright,* 791 F.2d 133, 135–36 (10th Cir.1986) (sections 1343 and 2314 create different crimes).

 Olano also argues that the jury's guilty verdict under count III is inconsistent with its not guilty verdict under count II. Jury verdicts on multiple counts generally are insulated from review on the ground that they are inconsistent. *United States v. Powell,* 469 U.S. 57, 68–69, 105 S.Ct. 471, 478–79, 83 L.Ed.2d 461 (1984); *Masoner v. Thurman,* 996 F.2d 1003, 1005 (9th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 643, 126 L.Ed.2d 602 (1993). We thus reject Olano's claim.

### III

Olano also challenges the adequacy of the district court's jury instructions.[7]

### A

Olano and Gray challenge their convictions under counts I, II, and III because the court's instructions permitted the jury to convict them based upon an invalid "intangible rights" theory of fraud.

---

**7.** Because we reversed Olano's conviction under count VI in *Olano I,* we need not address his

claim that the district court failed to give the jury a proposed "venue" instruction under that count.

### 1

■ We start our review with count II, which charged a violation of 18 U.S.C. § 1343. The jury instruction for count II informed the jury that:

One way in which the government may establish a scheme or artifice to defraud is to show beyond a reasonable doubt that a defendant, acting with a specific intent to defraud, has deprived a financial institution of the honest services of one of its officers or directors or of its right to have its business and affairs conducted honestly and impartially, free from deceit, fraud, undue influence and conflict of interest, and in a manner consistent with the fiduciary duty owing by officers and directors of the financial institution to the depositors and other shareholders of the institution.

This instruction was improper. In *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the defendants had been convicted under 18 U.S.C. § 1341. At trial, the jury had been instructed that the defendants were guilty if they "defraud[ed] the citizens ... of their right to have the Commonwealth's business and its affairs honestly, impartially, free from corruption, bias, dishonesty, deceit, official misconduct, and fraud...." *Id.* at 354 n. 3, 107 S.Ct. at 2878 n. 3. The Supreme Court reversed. The Court observed that section 1341 "protects property rights, but does not refer to the intangible right of the citizenry to good government." *Id.* at 356, 107 S.Ct. at 2879. The Court found that the instruction permitted the jury to convict the defendants solely because they defrauded Kentucky citizens of their right to have the state's affairs conducted honestly without finding that it had been defrauded of any money or property. *Id.* at 360–61, 107 S.Ct. at 2881–82.

This court applied *McNally* to section 1343 in *United States v. Hilling*, 891 F.2d 205 (9th Cir.1988), where we considered the same instruction used in count II for Olano and Gray. Relying upon *McNally*, we held that the instruction was "permeated with the pre-*McNally* right to honest services theory."

*Id.* at 207. Because section 1343, like 1341, protects property rights without reference to an institution's intangible right to honest conduct, we reversed Hilling's and Neubauer's convictions for conspiracy to violate section 1343 and remanded for a new trial.

■ The government argues that Congress overruled *McNally* and *Hilling* when it passed the Anti–Drug Abuse Act of 1988, which created 18 U.S.C. § 1346. Section 1346 provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to defraud another of the intangible right of honest services." Citing to *United States v. Berg*, 710 F.Supp. 438 (E.D.N.Y.1989), the government asserts that we should apply section 1346 retroactively to cover Gray's and Olano's conduct.

This court already has rejected this argument, holding that section 1346 "lacks retroactive force." *United States v. Telink, Inc.*, 910 F.2d 598, 601 n. 2 (9th Cir.1990). In fact, *Berg* no longer appears to be good law, as the Second Circuit has held that section 1346 does not apply retroactively. *See United States v. Schwartz*, 924 F.2d 410, 418–19 (2d Cir.1991).

Following *Hilling*, then, we find that Gray's conviction under count II was improper. In addition, because count I's conspiracy charge was predicated partly on Olano's and Gray's alleged wrongdoing under count II, this count, too, is tainted. We cannot rule out the possibility that the jury convicted Olano and Gray under count I for conspiring to deprive a financial institution of honest service. We thus reverse and remand Olano's and Gray's convictions under counts I and II. *Hilling*, 863 F.2d at 679.[8]

### 2

■ Olano's and Gray's convictions under count III must be reversed for the same reason. The court instructed the jury that Olano and Gray were guilty of count III if they caused the interstate transportation of the loan, "knowing it to have been taken through fraud, that fraud being the execution

---

8. Our decision to reverse obviates the need for us to reach Olano's argument that the district court erred in not giving a specific unanimity instruction for count I.

of the fraudulent scheme and artifice which is delineated in Count 2." Because this instruction renders count III derivative of the fraud charged in count II, the jury may have convicted Olano and Gray under count III because of their purported failure to render honest service.[9]

■ Olano and Gray contend that the remaining counts against them also are tainted by the invalidity of their convictions under counts I through III. They point to the district court's modified *"Pinkerton"* instruction in count I. *See Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946). In listing the elements that the jury had to find to convict Olano and Gray of conspiracy, the court gave the following instruction:

> Fourth, if you find the first three elements have been proved, you must decide whether the overt act was done for the purpose of carrying out the conspiracy. To give you an example that is completely unrelated to this case, there is nothing illegal about taking a cruise on a sailboat. It would be an "overt act," and thus an element of a conspiracy, only if shown to have been done for the purpose of carrying out an unlawful agreement. *It does not matter whether each defendant personally took part in that act, because once you have decided that a defendant was a member of the conspiracy, that defendant is responsible for what the other conspirators said or did to carry out the conspiracy, whether that defendant knew what they said or did or not.*

(Emphasis added). Olano and Gray assert that this instruction, given under the conspiracy count, permitted the jury to find them guilty under the *substantive* counts solely because of the acts of their coconspirators. Since we have reversed the conspiracy count, Olano and Gray argue, their convictions under the substantive counts necessarily are tainted.

We disagree. A typical *Pinkerton* instruction explicitly informs a jury that it can find a defendant guilty of a substantive offense if it finds that a coconspirator committed the same offense in furtherance of a conspiracy. *See, e.g., United States v. Castaneda,* 16 F.3d 1504, 1511 n. 6 (9th Cir.1994). The district court's *Pinkerton* instruction, in contrast, made no mention of the substantive counts. It stated only that a defendant was responsible for codefendants' acts for the purpose of determining whether he or she had committed an overt act in furtherance of the conspiracy. In addition, the jury instructions for the remaining substantive counts are inconsistent with *Pinkerton* liability. The instructions for these counts permit the jury to find a defendant guilty only if he personally committed the acts described as elements of the offense or aided and abetted the commission of those acts. Taken as a whole, then, the district court's instructions did not permit the jury to convict Olano and Gray under any counts, other than count I, merely because of the actions of their codefendants.

Even if the instructions permitted *Pinkerton* liability for the substantive counts, we still can affirm. If a jury is informed that it can find defendants guilty of a substantive offense because they (1) personally committed the offense, (2) aided or abetted a person who committed the offense, or (3) are vicariously liable pursuant to *Pinkerton,* and we later determine that *Pinkerton* liability is an improper basis for guilt, we need not reverse if "we find beyond a reasonable doubt that the jury would have convicted [the defendants] of each substantive count as aiders and abettors or as principals," and did not rely on *Pinkerton. Id.*

Olano's and Gray's convictions meet this standard. Gray was the only principal charged under counts IV and VIII; the other defendants—Olano and Ascani for count IV, and Olano only for count VIII—could be found guilty only if they aided and abetted Gray's commission of these offenses. The jury thus could not have found Gray vicariously liable under these counts but, instead, must have found him liable as a principal.

---

9. In light of our decision to reverse, we do not address Olano's argument that the district court failed to instruct the jury under count III that ownership of funds held in escrow does not pass until the funds are released—a claim which, in any event, appears to be foreclosed by our first opinion. *Olano I,* 934 F.2d at 1430–31, 1434.

The evidence also established Olano's guilt under count IV as an aider and abettor and under count IX for making a false statement to Home Savings. As we observed in our first opinion, the government's evidence proved that Olano engaged in a number of fraudulent acts to assist Gray in obtaining Home Savings' loan to McCuin, including the making of a false representation to Home Savings. *Olano I*, 934 F.2d at 1434. This evidence led us to conclude that Olano was aware that the ultimate disbursement of the loan was unlawful. *Id.* There thus is no reasonable doubt that Olano and Gray properly were convicted under these substantive counts, regardless of the *Pinkerton* instruction in count I.[10]

### B

■ Gray and Olano assert that the district court misinstructed the jury on the elements of count IV. In defining "misapplication of funds" under 18 U.S.C. § 657, the court stated: "Misapplication of funds occurs when funds are distributed under a record that misrepresents the true state of the record with the intent that *bank officials, bank examiners or the Federal Savings and Loan Insurance Corporation will be decieved*" (emphasis added). Olano and Gray assert that this instruction is too broad because a section 657 violation occurs only when a person defrauds a *bank*, not *bank officials*.

We disagree. We consistently have interpreted 18 U.S.C. § 656—section 657's counterpart for federally insured banks—in a manner which defines "misapplication of funds" to occur whenever "funds are distributed under a record which misrepresents the true state of the record with the intent that *bank officials, bank examiners or the Federal Deposit Insurance Corporation* will be deceived." *United States v. Unruh*, 855 F.2d 1363, 1371 (9th Cir.), *cert. denied*, 488 U.S. 974, 109 S.Ct. 513, 102 L.Ed.2d 548 (1988) (emphasis added, internal quotation omitted); *United States v. Kennedy*, 564 F.2d 1329,

1339 (9th Cir.), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978). Because sections 656 and 657 are functionally identical, "the elements [for violations] are the same." *United States v. Musacchio*, 968 F.2d 782, 787 n. 6 (9th Cir.1991). Consequently, like section 656, liability under section 657 can arise from a defendant's intentional deception of thrift officials. *United States v. Brown*, 912 F.2d 1040, 1044 (9th Cir.1990) (sufficient evidence supported conviction under § 657 where evidence showed that defendant intended to deceive "State Federal [Savings & Loan Association] officials, FSLIC and FHLB"). The district court's instruction was consistent with our precedent.

### C

■ In describing the elements of count IV, the district court instructed jurors that approval of a loan by a financial institution's board of directors is not a defense to a misallocation of funds charge. Olano contends that this was an incorrect statement of the law.

The court's instruction read:

Should you find a fraud occurred on a Savings and Loan Association, the fact that this fraud was approved by the Board of Directors ... is not a defense. *However, the fact* that the Board of Directors ..., if required, approved an action *may be considered to be evidence indicating that the action is not fraudulent.*

(Emphasis added). This instruction is correct. Although "consent to banking activities by bank officials or the board of directors may be a limited defense to a section 656 charge.... [e]vidence of a bank's consent based on its policies is treated as evidentiary matters [sic] that may be considered as part of the defense that there was either no willful misapplication or no intent to injure the bank." *United States v. Castro*, 887 F.2d 988, 995 (9th Cir.1989) (internal quotation

---

**10.** Olano also argues that, like counts I and III, his convictions under counts IV and IX are tainted by the "honest services" theory of fraud discarded in *McNally*. This argument is meritless. Unlike count II, the district court's instructions for count IV specifically required the jury to find that Home Savings suffered a loss of money because of Olano's and Gray's fraud. In addition, count IX charged Olano only with making a false statement to Home Savings, and did not require the jury to find that Home Savings suffered a loss of any kind—tangible or intangible.

omitted). "Thus, if [there is] an intent to defraud, approval of the board of directors is no longer material to whether there was a misapplication of bank funds." *United States v. Gregory,* 730 F.2d 692, 702 (11th Cir.1984), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1170, 1171, 84 L.Ed.2d 321 (1985) (internal quotation omitted).[11]

Consistent with these principles, the court's instruction informed the jury that board approval was not a complete defense to an alleged misapplication but, instead, was evidence that should be considered in determining whether the alleged misapplication was fraudulent. There was no error.

**D**

In count IX Olano was charged with violating 18 U.S.C. § 1014 because he presented a false financial statement to Home Savings in connection with the McCuin loan. The district court gave the following jury instruction to the jury under this count:

Fourth: That the defendant made the false statement with the specific intent to influence, in any way, the action of Home Savings *on a loan or loan application.*

(Emphasis added).

Olano contends that this instruction broadens the indictment because it does not mention the McCuin loan. At trial the jury heard testimony regarding another loan application from Joseph Casperone. Olano contends that the jury could have followed the court's instruction and found him guilty of violating section 1014 because of the Casperone, rather than McCuin, loan application. Since Olano did not object to this instruction at trial, we review for plain error.

There is some support for Olano's assertion of error. In *United States v. Harrill,* an indictment charged a defendant with violating section 1014 by fraudulently inducing a bank to approve requests for "loans and advances." 877 F.2d 341, 344 (5th Cir.1989). The jury instructions, however, permitted a

conviction under this charge for fraudulent inducement of a "change or extension" to a loan. Because evidence was adduced at trial regarding both "loans and advances" and "changes or extensions" to loans, the court of appeals could not discern whether the jury had convicted the defendant for conduct not alleged in the indictment. It thus reversed the defendant's conviction. *Id.*

The district court's instruction arguably opens the door to a similar uncertainty: it is conceivable that the jury convicted Olano for violating section 1014 with respect to the Casperone loan application, a crime not charged in the indictment. We need not decide this question, however. Assuming that the instruction was erroneous, Olano must demonstrate that it caused him prejudice to establish plain error.[12]

This he has not done. The district judge read the charge specifically mentioning the McCuin loan just before it gave the ambiguous instruction. Taken as a whole, the instructions sufficiently refer to the McCuin loan to make it extremely doubtful that the jury convicted Olano on the basis of Casperone's loan application. *See United States v. Thurnhuber,* 572 F.2d 1307, 1309 (9th Cir. 1977) (instructions on element of bank fraud violation were not misleading when "viewed as a whole"). Consequently, we find no plain error in the district court's instruction.

**E**

As the district court read its instructions for count IX to the jury prior to closing argument, it informed the jury of the penalty and punishment for a violation of 18 U.S.C. § 1014. Olano claims that this was reversible error, though he did not object at trial.

"[I]t is inappropriate for a jury to consider or be informed of the consequences of their verdict." *United States v. Frank,* 956 F.2d 872, 879 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 363, 121

**11.** Although *Castro* and *Gregory* were decided under 18 U.S.C. § 656, their reasoning is equally applicable to 18 U.S.C. § 657.

**12.** An erroneous jury instruction is susceptible to harmless error analysis and, therefore, cannot

constitute per se plain error. *See United States v. Smith,* 891 F.2d 703, 709 (9th Cir.), *cert. denied,* 498 U.S. 811, 111 S.Ct. 47, 112 L.Ed.2d 23 (1990). We see no reason to presume prejudice from the district court's instruction.

L.Ed.2d 276 (1992). This information tends "to draw the attention of the jury away from their chief function as the sole judges of the facts, open the door to compromise verdicts and to confuse the issue or issues to be decided." *Id.* (internal quotation omitted); *see also United States v. Wilson,* 506 F.2d 521, 522–23 (9th Cir.1974). However, an instruction improperly mentioning the penalty for a crime does not require reversal if the context in which it is given indicates that reference to the penalty did not influence the jury's decision. *See, e.g., United States v. Paduano,* 549 F.2d 145, 147 (9th Cir.), *cert. denied,* 434 U.S. 838, 98 S.Ct. 129, 54 L.Ed.2d 100 (1977).

We are confident that the district judge's apparently inadvertent mention of the potential penalties under count IX did not affect the jury's verdict. The district judge realized her error shortly after reading the jury instructions and so informed counsel. She later told the jury that some changes would be made to the final written instructions that they would receive. These final instructions, which the jury possessed during their deliberations, omitted all reference to count IX's potential penalties. Given these remedial steps, we find no plain error arising from the district judge's initial oral instruction.

### F

■ Olano contends that the district court misinstructed the jury on the concept of reasonable doubt. Olano did not object to this instruction.

The court's reasonable doubt instruction was drawn from Ninth Circuit Model Jury Instruction No. 3.04 (1985). It instructed jurors that they should return a guilty verdict only if they "find the evidence so convincing that an ordinary person would be willing to make the most important decisions in his or her own life on the basis of such evidence." We have held that this instruction, though not favored, is not improper. *United States v. Jaramillo–Suarez,* 950 F.2d 1378, 1386 (9th Cir.1991). There was no plain error.

### G

Olano claims that the district court failed to give an instruction on his theory of the defense. Olano, however, never tendered a theory of the defense instruction to the district court, and the record does not support his assertion that he joined in the theory of defense instructions tendered by his codefendants. We thus reject his claim of error.

### IV

Olano and Gray next argue that the district court erred in several evidentiary rulings.

### A

Olano asserts that the district court improperly admitted evidence outside of the time frame of the conspiracy alleged by the government. We consider each alleged error separately.

### 1

Olano again attacks the district court's decision to admit evidence regarding Hilling's and Neubauer's acquisition of Irving Savings, which Olano sought to exclude in a motion in limine. As already discussed, this testimony was relevant background information.

### 2

■ Olano complains that the government introduced into evidence a letter written by Lapaglia to Olano in 1986, a time approximately two years after Olano's alleged conspiracy. Lapaglia wrote this letter asking Olano to repay part of a $150,000 debt, money Lapaglia needed to pay the Internal Revenue Service in order to obtain an early release from prison.

The government introduced this letter, which made an implied threat to Olano, in order to blunt Olano's impeachment of Lapaglia during cross-examination. Impeachment was a legitimate purpose to introduce the Lapaglia letter, *cf. United States v. Parker,* 991 F.2d 1493, 1497 (9th Cir.) (admissibility of impeachment evidence demonstrating bias), *cert. denied,* — U.S. ——, 114

S.Ct. 121, 126 L.Ed.2d 86 (1993), and the district court did not abuse its discretion admitting it.

### 3

■ Olano contends that the district court improperly admitted a cease and desist order, and related correspondence, which the Federal Home Loan Bank Board issued against Alliance Federal in 1982. The government introduced this evidence to explain Olano's operation of Alliance Federal during the time of the conspiracy, and the district court gave a limiting instruction directing the jury to consider this evidence only for background purposes.

Such evidence was appropriate background information. *See, e.g., United States v. Wolf,* 820 F.2d 1499, 1505 (9th Cir.1987) (bank's prior violation of lending limits admissible background evidence bearing on motive and intent in misapplication of funds trial), *cert. denied,* 485 U.S. 960, 108 S.Ct. 1222, 99 L.Ed.2d 423 (1988). The district court did not abuse its discretion in admitting it.[13]

### B

■ During its cross-examination of co-defendant Kalterman, the government introduced into evidence a scrambler telephone. This device blocked electronic surveillance of telephone conversations through the attachment of a scrambler to each telephone in a conversation. Kalterman admitted that he owned the scrambler telephone. He also admitted that a direct, private telephone line had been installed between his and Olano's offices. The prosecution questioned Kalterman if the purpose of the phone was to enable him to speak confidentially with Olano about illegal loan transactions.

Olano complains that he received no pretrial notice that the government would introduce the scrambler telephone into evidence. The government gave such notice to Kalterman, but not to Olano, because it intended to introduce the phone only against Kalterman. Olano contends that the government's failure to give him notice violated Federal Rule of Criminal Procedure 16(a)(1)(C).

Rule 16(a)(1)(C) provides that a criminal defendant is entitled to discovery of tangible objects which are in the government's possession and "which are material to the preparation of the defendant's defense." Fed. R.Crim.P. 16(a)(1)(C). To sustain a claim that an object should have been produced pursuant to Rule 16, "a defendant must make a prima facie showing of materiality." *United States v. Mandel,* 914 F.2d 1215, 1219 (9th Cir.1990). To do this, a defendant must demonstrate that the object would have been helpful to his or her defense. *Id.; United States v. Little,* 753 F.2d 1420, 1445 (9th Cir.1984).

Olano has not satisfied this burden. He has offered no explanation of how prior notice of the telephone would have benefitted his defense, nor what he would have done differently at trial had he been aware of it. In fact, Olano's protestations that the scrambler was "unrelated to any issue in this case" and "devoid of probative value" suggest the opposite, that notice would not have helped him to prepare his defense.

■ Olano also suggests the probative value of the scrambler telephone was outweighed by its potential prejudice. We do not believe that the district court abused its discretion in this regard. The scrambler telephone demonstrated Kalterman's strong interest in keeping his telephone conversations secret, a fact probative of whether and how Kalterman engaged in illegal, conspiratorial conduct. Further, given Kalterman's acquittal, we find it unlikely that the telephone was any more than minimally prejudicial.

### C

■ The government called agent Joseph Dooley, a certified public accountant who was the case agent for this investigation, as a summary witness. Through the use of a number of charts, Dooley summarized the

---

**13.** Olano cites to *United States v. Christo,* 614 F.2d 486, 494–95 (5th Cir.1980), to argue that cease and desist orders issued outside the time of a conspiracy are inadmissible. *Christo* is distinguishable from the present case because the cease and desist order there occurred *after* the alleged conspiracy and did not constitute background material.

evidence presented by the government's preceding witnesses. Observing that Dooley was not qualified as an expert witness, Gray contends that the district court improperly permitted the use of Dooley's testimony and charts.

We recently rejected a nearly identical claim in *United States v. Baker*, 10 F.3d 1374 (9th Cir.1993). In *Baker*, the government called a federal agent, who was a certified accountant, to summarize its evidence regarding the value of the narcotics sold by the defendants. The defendants objected to this testimony and to the admission of charts used by the witness to assist her in giving her summary to the jury. We held that the district court properly admitted the agent's testimony and charts pursuant to Federal Rule of Evidence 611(a), even though the agent was not an expert for the matters she was summarizing. *Id.* at 1412. In so concluding, we stated that we were not "blind to the dangers of witnesses summarizing oral testimony, and we believe that such summaries should be admitted under Rule 611(a) only in exceptional cases." *Id.* We observed, however, that the court had required the government to lay a foundation for the summary evidence outside of the presence of the jury, that the defendants had been provided an opportunity to review the summary charts prior to their admission, and that the court had given limiting instructions informing the jury that neither the agent's summary testimony nor the summary charts was admissible as substantive evidence. *Id.* at 1412–13.

The same circumstances are present in this case. The district court examined the government's summary charts prior to their admission to the jury, the defendants had an opportunity to review the charts, and the court gave a limiting instruction informing the jury that the summaries were not being admitted as substantive evidence. The defense also had an opportunity to cross-examine Dooley, even though this cross-examination occurred after a lengthy recess. Following *Baker*, then, we hold that the admission of Dooley's testimony and the summary charts was not an abuse of the district court's discretion.

**D**

■ Olano and Gray sought to introduce into evidence a civil judgment issued by a court in Texas. This judgment found that an Irving Savings letter of credit, which Gray had given to businessman John Turner in exchange for a certain business interest, was valid and enforceable against Irving Savings. The district court refused to admit the Texas judgment but permitted Turner to testify that the Texas court had held the letter of credit to be valid and enforceable. Turner also testified that Hilling had had actual and apparent authority to issue the letter of credit.

Olano argues that the district court abused its discretion in not admitting the Texas judgment. We disagree. Olano's attorney waived any objection to the judge's decision when he expressly assented to the district court's decision not to admit the judgment, stating, "I have no intention nor do I ask the Court to admit the document."

In addition, the district court found under Federal Rule of Evidence 403 that the judgment's "marginal" relevance to the case was outweighed by its potential to mislead the jury and to prejudice the government. "[T]rial courts have very broad discretion in applying Rule 403 and, absent abuse, the exercise of its discretion will not be disturbed on appeal." *Borunda v. Richmond*, 885 F.2d 1384, 1388 (9th Cir.1988) (internal quotation omitted).

The United States was not a party to the Texas proceeding and, therefore, was not bound by its findings and rulings. There was no indication how the Texas court made its findings or what evidence it relied upon. Further, the district court believed that there was a risk that the jury would give the judgment undue emphasis or would be confused by additional testimony concerning the Texas proceeding. Given these circumstances, we conclude that the district court acted within its broad discretion in not admitting the document. *See United States v. Tidwell*, 559 F.2d 262, 266–67 (5th Cir.1977) (in action charging bank officers with unauthorized issuance of letter of credit and mis-

application of funds, final judgment in mortgage foreclosure proceeding properly excluded under Rule 403 because relevance outweighed by potential to confuse issues and to mislead jury), *cert. denied,* 435 U.S. 942, 98 S.Ct. 1520, 55 L.Ed.2d 538 (1978).

### E

██ Randall Roth, an attorney who worked in Olano's law office, testified about certain aspects of Olano's sale of the Dauphine Condominiums to McCuin. Olano contends that the court should have barred this testimony because it was protected by the attorney-client privilege.

"Under the attorney-client privilege, confidential communications made by a client to an attorney to obtain legal services are protected from disclosure." *Clarke v. American Commerce Nat. Bank,* 974 F.2d 127, 129 (9th Cir.1992). Because the privilege "has the effect of withholding relevant information from the factfinder, it is applied only when necessary to achieve its limited purpose of encouraging full and frank disclosure by the client to his or her attorney." *Id.* Not all attorney-client communications are protected from discovery:

> Our decisions have recognized that the identity of the client, the amount of the fee, the identification of payment by case file name, *and the general purpose of the work performed* are usually not protected from disclosure by the attorney-client privilege. However, correspondence, bills, ledgers, statements and time records which also reveal the motive of the client in seeking representation, litigation strategy, or the specific nature of the services provided, such as researching particular areas of law, fall within the privilege.

*Id.* (citations omitted, emphasis added).

Roth's testimony falls into the category of unprotected communication. Roth stated that he had opened a bank account for Olano, had reviewed and completed certain condominium documents, and had conveyed certain messages from McCuin to Olano. None of these statements divulged Olano's motives, strategies or goals in the sale of the Dauphine Condominiums. Roth's testimony, instead, provided only general descriptions of the work that he performed on Olano's behalf. It was not privileged. *See, e.g., McKay v. Commissioner,* 886 F.2d 1237, 1238 (9th Cir.1989) (attorney's testimony that he conveyed information from government to client not privileged).

### F

██ Olano asserts that government witness William Ryan contravened the district judge's ruling on a motion in limine, which forbade the parties from introducing evidence that Alliance Federal had gone out of business. During direct examination, the prosecutor asked Ryan how long he had worked full-time at Alliance Federal. Ryan responded, "I would say the last three years that the institution was in business."

Upon hearing Ryan's remark, counsel for a codefendant informed the judge of the error. The court observed that the jury probably did not pick up on Ryan's passing remark and asked the attorney if he wanted a limiting instruction. The attorney did not request a limiting instruction. Instead, he simply asked for the government to reinstruct its witnesses not to testify about the failure of Alliance Federal.

Olano correctly points out that Ryan violated the district court's in limine ruling. We are confident, however, that the remark was harmless beyond a reasonable doubt. Both the court and apparently the objecting attorney believed that the remark was not noticed by the jury. None of the attorneys asked for a limiting instruction, despite an offer by the district judge to give one. It is clear that both the court and the parties were convinced that Ryan's statement did not influence the jury's verdict, and so are we.

### G

██ Olano sought to admit two letters from Home Savings' loan files under the business records exception to the hearsay rule. Fed.R.Evid. 803(6). The district court acknowledged that the letters were business records but determined that they were untrustworthy because they appeared to be prepared in anticipation of litigation.

██ The business records exception applies only where a business record is trustworthy. *Id.* The district court has wide discretion in determining whether a business record meets this standard. M. Graham, *Federal Practice & Procedure* § 6757, at 624 (1992). Olano has provided no explanation as to why the district court abused its discretion, and we can find none. We reject his claim of error.

## H

██ Olano asserts that the district court improperly denied his motion in limine, which asked the court to preclude the government from using two prior convictions to impeach him if he testified. Olano did not testify because the court denied this motion.

We decline to consider Olano's claim. "[T]o raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." *Luce v. United States,* 469 U.S. 38, 43, 105 S.Ct. 460, 464, 83 L.Ed.2d 443 (1984). Because Olano did not testify, he did not preserve this issue for appeal. *Id.; United States v. Williams,* 939 F.2d 721, 724–25 (9th Cir.1991); *United States v. Johnson,* 903 F.2d 1219, 1222 (9th Cir.), *cert. denied,* 498 U.S. 985, 111 S.Ct. 520, 112 L.Ed.2d 531 (1990).

## I

██ Olano asserts that the district court violated his Confrontation Clause rights by admitting the grand jury testimony of codefendant Marley. Olano, however, consented to the prosecution's reading of this testimony to the jury. He thus waived his right of confrontation with respect to this testimony. *Cf. United States v. Goldstein,* 532 F.2d 1305, 1314–15 (9th Cir.), *cert. denied,* 429 U.S. 960, 97 S.Ct. 384, 50 L.Ed.2d 327 (1976).

## V

In *Olano I,* we reversed Olano's convictions under counts VI and VIII and Gray's convictions under counts V, VI and VII. For the reasons expressed above, we now also reverse and remand Olano's convictions under counts I and III and Gray's convictions under counts I, II, and III.[14] We affirm Olano's convictions under counts IV and IX and Gray's convictions under counts IV and VIII.

REVERSED in part, AFFIRMED in part, and REMANDED. Each party to bear its own costs.

REINHARDT, Circuit Judge, dissenting:

As the majority explains, we now consider for the first time one of the errors that occurred during the trial of this case—the error of the absent juror. Previously, we considered a different and less egregious error but were reversed by the Supreme Court after it found that, while the error occurred, it did not constitute plain error. In reaching this conclusion, the Court "clarified" the requirements of Rule 52(b), the plain error rule. The majority now applies those clarified requirements; however, in doing so, it errs. It fails to examine the *kind* of error involved, and confuses the question of the reliability of the verdict with the question of the existence of a structural defect in the proceedings. Had the majority performed the proper analysis for determining structural error, it would be required to conclude, as I do, that the absence of one or more jurors during a portion of the taking of trial testimony constitutes a structural defect. In my opinion, we not only have the authority to correct the fundamental error we now consider, but the nature of that error compels the exercise of our discretion. Accordingly, I dissent.

\* \* \*

To briefly summarize the facts, on the 28th day of trial, one of the jurors became ill. After a discussion of various options, all counsel agreed that the juror should go home, miss the remaining afternoon testimony, and read the trial transcripts on his return. The ill juror returned the following day. During his absence, Carole Lawrence, Olano's personal secretary, testified for the

---

14. Our reversal of these counts, and our reversal of other counts in *Olano I,* renders it unnecessary for us to consider objections to the sentences and restitution penalties, which must be redetermined upon remand.

government regarding Olano's and Gray's participation in the McCuin loan. The juror had been present during the government's direct examination of Lawrence, but missed all of the cross-examination, redirect, recross, and rebuttal. He also missed a portion of the direct testimony of Kenneth A. Kuebel, an appraiser hired by the government to appraise one of the properties involved in the transaction leading to Olano's indictment. The absent juror was furnished a copy of the pertinent transcript following his return. On appeal, Olano argues that the absence of a juror during a part of the time that trial testimony is being adduced constitutes plain error and urges the reversal of his conviction.

The "plain error" rule permits reversal of a conviction only if there is an error, the error is "plain," and it "affects substantial rights." The majority acknowledges that proceeding with the trial during the juror's absence was "error" and that the error was "plain." Our sole disagreement is over whether the error "affected substantial rights." In *Olano (I)*,[1] the Court identified three types of errors that may meet this criterion: 1) prejudicial errors that affect the outcome of the lower court proceedings; 2) errors that are presumptively prejudicial regardless of a defendant's ability to make a specific showing of prejudice; and 3) special forfeited errors that can be corrected regardless of their effect on the outcome. —— U.S. at ——, 113 S.Ct. at 1778. Without commenting on whether the absence of the juror while witnesses were testifying resulted in an error that is presumptively prejudicial, what the difference is between that kind of error and special forfeited errors that can be corrected regardless of their effect upon the outcome, or whether errors may fall in both of those categories simultaneously, it seems absolutely clear to me that, at a minimum,

the error falls within the third category, commonly referred to as structural error.

Although in *Olano (I)*, the Court did not elaborate on the precise contours of the third category, it did refer us generally to *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1990), a case which attempted to set forth the distinction between trial errors and structural errors. *Fulminante* defined trial error as "error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." 499 U.S. at 307-08, 111 S.Ct. at 1264. In contrast, it defined structural defects as errors that "affect[ ] the framework within which the trial proceeds, rather than simply an error in the trial process itself." 499 U.S. at 310, 111 S.Ct. at 1265. According to *Fulminante*, structural errors, unlike trial errors, are not subject to a prejudice analysis, but require automatic reversal. Although the majority, here, recognizes the existence of the category of structural errors, it concludes that a juror's absence during a portion of a trial does not fall within that category. With this conclusion, I strongly disagree.

While *Fulminante* suggested a sharp trial error/structural error dichotomy,[2] *Olano (I)* demonstrates that the relevant categories are somewhat more difficult to define and that the category of *non*-structural errors includes more than "trial type errors." In *Olano (I)*, the Court held that the presence of alternate jurors during deliberations was erroneous, and that it undermined the policy of shielding the jury from improper influence.[3] However, the Court found that the issue of improper outside influence had historically been reviewed under a prejudice standard—that reversal in such cases had

---

1. Throughout this dissent, the Supreme Court's decision is referred to as *"Olano (I)"* and the majority's decision on remand as *"Olano (II)."* This nomenclature differs slightly from that employed by the majority.

2. Post–*Fulminante* cases often conceptualize the *Fulminante* framework as a clear dichotomy. *See, e.g. Hegler v. Borg*, 50 F.3d 1472, 1473-74 (9th Cir.1995) ("[*Fulminante* ] divided the class

of constitutional errors that may occur during the course of a criminal proceeding into two categories: trial error and structural error.").

3. The alternate jurors were allowed to retire with the jury with the consent of the parties. Prior to retirement, the alternates were admonished not to participate in the deliberations, but merely to observe.

been ordered only when actual prejudice could be demonstrated—and that there was no reason to depart from the historic practice. Thus, the Court concluded that cases involving improper outside influence did not fall into the "third category"—i.e. defects which "affect substantial rights" *independent of a prejudice inquiry.* —— U.S. at ——, 113 S.Ct. at 1780.

*Olano (I)* erases the sharp line that *Fulminante* appeared to draw.[4] Clearly, the presence of alternate jurors during jury deliberations has nothing to do with the presentation of evidence to the jury, the category of trial type error described in *Fulminante.* Thus, *Olano (I)* demonstrates that simply because an error is *not* a trial type error, it does not necessarily follow that the error is "structural."

Central to the Court's holding that the presence of the two alternate jurors in the jury room at the conclusion of Olano's trial did not constitute a structural defect was its characterization of the nature of the error. The Court examined the *general* problem of the presence of alternate jurors while a jury is deliberating—in other words, it considered the "kind of error" involved and not the particularities of the specific case before it. The Court classified the kind of error involved as one pertaining to "outside or improper influence on the jury" and held that errors of that nature had always been reviewed under a prejudice standard. Notably, it did *not* characterize the error as a flaw in the composition or functioning of the jury itself, a wholly different kind of error that would have required a different kind of review. Here, the majority should have engaged in the same type of analysis that the Court performed in *Olano (I).* It should first have looked to the *kind* of error involved and characterized its nature; only

then should it have sought to determine whether the *kind* of error involved should be classified as "structural" or non-structural.

The majority never attempts to analyze the *kind* of error involved here—the absence of jurors during the taking of trial testimony. Instead, without recognizing that it is applying a standard it has already held that the defendant cannot meet, it first conducts a prejudice or presumptive prejudice inquiry regarding the particular facts of the case before us, and then because it finds no such prejudice with respect to those specific facts, it concludes that the error is not structural.[5] The majority reasons that whether the absence of the juror in this case constituted a structural defect "depend[s] on whether a criminal trial can 'reliably serve its function as a vehicle for determination of guilt or innocence' *when not every juror has observed every minute of the testimony of every witness at* trial." Maj. at 1189 (emphasis added). That, of course, is not the proper inquiry. The question the majority should have asked is "whether the absence of one or more jurors during a part of the time that trial testimony is being adduced affects the framework within which the trial proceeds." By asking whether every juror must observe every minute of the testimony in a trial, the majority focuses on the specific factual circumstances of the case—the specific event that occurred rather than the kind of error involved. Whether one juror was absent or five, whether one day's testimony was missed or three, and whether the missed testimony was of particular importance or not, does not alter the *nature* of the error or the category into which that error falls; rather, those factors relate solely to the prejudicial effect of the specific error.

The question posed by the majority ultimately embodies a prejudice inquiry in two

---

4. In his dissent in *Fulminante,* Justice White pointed out that the majority's effort to draw such a line, in order to place coerced confessions on the wrong side of it, was contrary to all past precedent and was unworkable. 499 U.S. at 291, 111 S.Ct. at 1254–55. Therefore, it came as no surprise that the Court abandoned this distinction shortly thereafter when faced with a case in which its application might have required it to reverse the defendant's conviction for reasons it found unsatisfactory.

5. As a result of the majority's failure to examine the *kind* of error involved, it is not clear whether it is performing an actual prejudice or presumptive prejudice analysis. However, that is of no practical significance here. Neither form of analysis is appropriate when a court is examining the third category of errors that "affect substantial rights," i.e. structural defects.

ways: 1) by focusing narrowly on the specific circumstances relating to the absent juror in the particular case; and 2) by focusing narrowly on whether that trial is likely to produce a reliable verdict. The unreliability of a particular outcome—or even the general unreliability of outcomes in cases of the type involved—is not the touchstone for determining the existence of structural defect. In fact, while unreliability of outcome resulting from a particular *kind* of error may be sufficient to warrant a reversal without a showing of *specific* prejudice, unreliability is not a necessary component of *structural* error. Few of the examples of structural defects cited by the majority and listed in *Fulminante* involve the unreliability of the trial's outcome. Rather, other fundamental values ordinarily serve as the foundation for a structural defect determination. If is difficult to argue that a criminal trial fails to "reliably serve its function as a vehicle for determination of guilt or innocence" because a racially segregated grand jury returned the initial *indictment*, because a defendant was denied the opportunity to represent himself at trial, or because the media or public received less than full access to the trial proceedings. *See Fulminante*, 499 U.S. at 309–10, 111 S.Ct. at 1264–65 (categorizing these types of errors as structural). Rather, the crucial factor present in deeming these errors "structural" is that they affect the framework within which the trial proceeds or constitute defects in the trial mechanism. These errors undermine a fundamental value in the trial process apart from truth seeking and the reliability of the guilt or innocence adjudication. *Cf. Rose v. Clark*, 478 U.S. 570, 587, 106 S.Ct. 3101, 3110–11, 92 L.Ed.2d 460 (1986) (Stevens concurring).

Prior cases describe at least two types of defects which may properly be classified as structural—defects which alter the basic framework in which the trial proceeds, and defects which undermine some fundamental value underlying the trial process as a whole.

*See, e.g. Fulminante*, 499 U.S. at 309–11, 111 S.Ct. at 1264–66; *Rose*, 478 U.S. at 586–89, 106 S.Ct. at 3110–12. The *kind* of error involved here—the absence of jurors during trial testimony—fits both descriptions.[6]

First, the absence of one or more jurors during trial alters the basic framework in which the trial proceeds. It seems clear that if a jury trial is to be conducted, then the jury must in fact be there. A jury as an entity is neither more nor less than the sum of its parts. For the entity to exist, all of its members need be present, and when one or more is absent from a part of the trial, then the jury as an entity is also absent. To proceed with a "jury trial" in the absence of the jury is to proceed with a structurally flawed process. Because absent jurors alter the fundamental nature of the proceeding, this type of error amounts to a structural defect.

"Having a jury" at a bare minimum must mean having a jury *present*. This essential connection is so plain that it has never before been questioned. Neither party nor the majority has cited a case in which the taking of evidence and testimony during a trial has proceeded in the absence of one or more jurors, and my independent research has turned up none. It is often true that a society's deepest convictions lie in what is assumed rather than what is discussed; in this case, the sheer novelty of the question demonstrates the incompatibility with our system of criminal justice of the procedure followed in the district court.

Second, the absence of one or more jurors during the taking of testimony undermines the fundamental values inherent in our system of trial-by-jury. The essential function of a jury is the "interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence." *Williams v. Florida*, 399 U.S. 78, 100, 90 S.Ct. 1893, 1906,

---

6. If the type of error committed undermines the reliability of the verdict, it may well be, as the majority suggests, that it, too, qualifies as structural error. However, the reliability criterion seems better suited to an effort to assess a separate but related type of error that may "affect substantial rights"—errors that are presumptively prejudicial regardless of the defendant's ability to make a showing of actual prejudice. *See Olano (I)*, —— U.S. at ——, 113 S.Ct. at 1778. Reversal is mandated in such cases as well.

26 L.Ed.2d 446 (1970). A central facet of this deliberative process is that individual jurors harmonize their individual recollections and perceptions of the trial proceedings. This collective effort to piece together a coherent and consistent story often exposes deceptions or distortions, sometimes subtle, that may otherwise be overlooked. *Cf. Johnson v. Louisiana*, 406 U.S. 380, 389, 92 S.Ct. 1643, 1647–48, 32 L.Ed.2d 170 (1972) (Douglas dissenting). In the case of an absent juror, the collective effort is short-circuited because one of the participants lacks the ability to fully evaluate the testimony he missed, or to challenge others' impressions of witnesses or their recollections of specific exchanges.

Moreover, conducting the trial in the absence of a part of the jury offends our basic notions of due process and our fundamental concept of a fair trial. One can easily sympathize with the desire of judges and lawyers to save time here and there—they are busy people—but at what cost? Here, the cost was the integrity of the jury system itself. It is the system which is denigrated when the presence of all jurors throughout the proceedings is deemed unimportant. Confidence in and respect for the jury system is weakened if so little significance is attached to the role played by the individual jurors.

If a juror had been held up in traffic on a particular day, could the trial have started without him, and been fair to the defendant? Could the jurors have taken their lunch breaks two or three-at-a-time, so that testimony might be taken continuously throughout the day? Surely longer trial days, filled with more testimony, would be possible if jurors sat in three overlapping shifts, with eight persons present at all times. But would that truly be a jury trial as we know it? The jurors could all read the transcripts of what happened in their absence, and fill each other in at the time that deliberations commenced. We would presume, according to one of our most dubious presumptions, that each juror read the entire transcript, if the judge instructed him to do so. So where would be the harm? The harm is that we do not now nor have we at any time ever allowed trial by transcript in this country—even in a lengthy trial in which a judge

attempting to appease a rebellious jury, or seeking to prevent the number of available jurors from falling below twelve, might be tempted to allow its members to fulfill important personal engagements from time to time while the trial proceeded without them. In my view, the integrity of the criminal justice system requires that evidence not be taken unless the entire jury is present.

As previously noted, the majority cannot cite a single case that supports its conclusion. Instead it relies on two woefully inapt analogies. In its first analogy, the majority reasons that a "juror who is physically absent during testimony is indistinguishable from a juror who is mentally absent because he or she is asleep." Maj. op. at 1189. However, a mentally absent juror is as distinguishable from a physically absent juror as an inattentive judge is distinguishable from a non-existent one. The absence of a judge during portions of a trial would certainly call into question the basic integrity of the proceeding in a way that the presence of a judge who is sometimes distracted from the events taking place before him, or even of a judge who dozes occasionally, does not. The presence of the jury is at least as important as the presence of the judge, probably more so, since it is the jury that must make the factual determinations, assess the credibility of the witnesses, and render the verdict of guilt or innocence. Thus, the absence of one or more jurors like the absence of a judge calls into question the integrity of the proceeding. Given these circumstances, it is difficult to understand why the majority equates the kind of error represented by an absent juror with the kind of error represented by a juror who is merely inattentive or nods off. Certainly my colleagues provide no reasoned explanation in support of their assertion that these two wholly different kinds of errors should be treated similarly. Instead, they merely state the obvious—that in neither case does the juror "observe witness testimony."

The majority's error in advancing so inapt an analogy results in large part from its initial failure to analyze and categorize the *kind* of error involved. Sleeping during trial has historically been classified as juror mis-

conduct, and in turn, juror misconduct has historically been reviewed under a prejudice standard. *See, e.g. United States v. Springfield*, 829 F.2d 860 (9th Cir.1987); *United States v. Barrett*, 703 F.2d 1076, 1082–83 (9th Cir.1983); *United States v. Hendrix*, 549 F.2d 1225 (9th Cir.1977). In contrast, the error here cannot under any form of reasoning be classified as "juror misconduct." The decision to continue with the admission of evidence in the absence of a juror is a deliberate action on the part of court and counsel that infringes on the defendant's fifth and sixth amendment rights; it is not a shortcoming on the part of a juror that is discovered only after the fact. In short, the error is committed by those in charge of the proceeding, and it results in the conducting of a part of trial with an essential participant missing. The error affects the trial mechanism or framework. Thus, the defect is structural in nature and is not subject to harmless error review.

The majority also analogizes the case of an absent juror to an error involving the admission of hearsay testimony. The majority argues that the absence of a juror simply affects the juror's ability to evaluate the demeanor of witnesses; it equates the absent juror's inability to evaluate the part of the trial he missed with a present juror's inability to evaluate hearsay testimony. The majority then concludes that because the erroneous admission of hearsay testimony is reviewed under a prejudice standard, so too should errors involving the absence of jurors.

It is difficult to take this argument seriously. One of its most obvious flaws is that it proves far too much. Under the majority's reasoning, *none* of the jurors need be present for *any* of the trial. After being sworn, they could simply go about their individual business, reconvene when the testimony was concluded, and retire to the jury room with the transcript. But in addition to proving too much, the analogy misses the point. Unlike hearsay, here we are less concerned with the actual testimony that transpired during the questioned moments than with the proper functioning of the trial mechanism, and with the integrity of the jury system itself. The absent juror is problematic not simply because of what happened in his absence but, more important, because of the fact that he was absent. It is that fact that serves to distort the trial process, not the substance of the specific evidence presented while the juror is gone.

The majority also fails to point out that much hearsay evidence is admissible. There are numerous exceptions to the hearsay rule including a broad catch-all provision, and an error with respect to the admission of such testimony is little different from any other error with respect to the admission of trial testimony. More important, the true comparison the majority is offering is not between the absent juror and *erroneously admitted* hearsay testimony, but between the absent juror and the use of hearsay testimony itself, proper or improper. Whenever hearsay testimony is adduced, in accordance with the rules or otherwise, the jury does not observe the person whose out-of-court statement is being admitted into evidence. If the existence of the hearsay rule means that hearing witnesses in person is as unimportant as the majority implies, we should be able to revise radically the functioning and operation of the jury system, at a considerable savings to the taxpayer. However, in my view, the majority is simply way off base here; the hearsay analogy does not advance its argument in the slightest degree.

In summary, Olano was entitled to the *presence* throughout the trial proceedings of the twelve impartial jurors who were selected to serve and to determine his fate.[7] Some

---

**7.** Rule 23(b) of the Federal Rules of Criminal Procedure allows the parties to stipulate to a jury of fewer than twelve, and rule 23(a) allows the defendant to waive a jury trial altogether. However, there were no such waivers here. Olano was convicted by a jury of twelve; his complaint is that one of the twelve was absent during a portion of his case. Twelve were empowered to decide Olano's fate; the same twelve were obligated to hear the testimony bearing on his guilt or innocence. A verdict by an agreed-upon number of eleven jurors who hear all the evidence is simply not the same as a verdict by eleven informed jurors and one person who either guesses about a portion of the trial or goes along with the others as to that part.

Moreover, even if this case could be viewed as a stipulation to a temporary jury of eleven, rule 23 requires such a stipulation to be in writing.

**1212**

jurors may be more or less attentive, more or less observant, more or less intelligent, or even more or less indifferent to the testimony adduced before them. Although these factors undoubtedly affect the "quality" of the jurors' presence, it is a fundamental premise of the jury system that twelve jurors sworn to serve, be they drowsy, bored or resentful, must be in attendance throughout the trial. Conducting parts of a trial in the absence of one or more jurors erodes the integrity of the jury process and "affects the substantial rights" of any defendant tried in such a proceeding.

As the Court explained in *Olano (I)*, if a plain error affects substantial rights, we have the authority under Rule 52(b) to correct it. However, the Court also explained that once we have ascertained that we have that authority, we must make a separate determination as to whether the error warrants the exercise of our discretion. Only errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings" are deserving of correction on plain error review. *Olano*, —— U.S. at ——, ——, 113 S.Ct. at 1779, 1781.

By its very nature, the error before us affected the integrity and public reputation of the judicial proceeding, and, in my opinion, we must exercise our discretion to correct it. Indeed it is difficult to imagine how *any* structural error—error that by definition affects the basic framework in which the trial proceeds or undermines some fundamental value underlying the trial process as a whole—would not necessarily impugn the integrity and public reputation of the judicial proceeding involved, if not the judicial process itself. However, it is not necessary to explore that conundrum here. Suffice it to say that a conviction obtained by means of a process that is as fundamentally flawed as is a trial in which a portion of the testimony is adduced in the absence of one or more jurors simply cannot withstand review under any standard. In my opinion, Rule 52(b) both

empowers and compels us to exercise our discretion to correct the egregious error which occurred in this case. Accordingly, I most respectfully dissent.

---

"An oral stipulation may, under certain circumstances, satisfy the Rule, but it must appear from the record that the *defendant personally* gave *express consent* in open court, *intelligently and knowingly*, to the stipulation." *United States v.*

*Guerrero–Peralta*, 446 F.2d 876, 877 (9th Cir. 1971). Nothing of the sort occurred here.