FILED

02/03/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0137

DA 23-0137

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 13

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

GRANT ALAN WEST,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DC-22-155(B)
Honorable Robert B. Allison, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

         Gregory D. Birdsong, Birdsong Law Office, Santa Fe, New Mexico

      For Appellee:

         Austin Knudsen, Montana Attorney General, Mardell Ployhar, Assistant Attorney General, Helena, Montana

         Travis R. Ahner, Flathead County Attorney, John Donovan, Deputy County Attorney, Kalispell, Montana

Submitted on Briefs: January 28, 2026

Decided:  February 3, 2026

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1  A masked and armed individual entered the Good Medicine Pharmacy in Columbia Falls, Montana, demanded a bottle of Percocet 10, and forced the pharmacy's three employees to hide in the bathroom while he fled.  One of the pharmacy's employees identified Grant West as the robber.  Officers arrested and charged West with robbery, aggravated kidnapping, and criminal possession of dangerous drugs.  A Flathead County jury found West guilty.  West appeals, raising the following restated issues:

1. *Did the District Court err in denying West's* Brady *motion when the State waited three days to disclose that a witness was hearing impaired?*

2. *Could any rational juror have found beyond a reasonable doubt that the State established the essential elements of robbery?*

3. *Did the State commit prosecutorial misconduct when it introduced evidence about West's alleged drug addiction and when it presented an overlay of security camera footage during closing argument?*

4. *Did West receive ineffective assistance of counsel?*

5. *Did the alleged cumulative errors deprive West of a fair trial?*

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2  The Good Medicine Pharmacy is located inside Super 1 Foods in Columbia Falls, Montana.  Just after 7 p.m. on April 13, 2022, three of the pharmacy's employees—Wendy Sunde, Jessica Baumgartner, and Shalyn Coker—had just finished work and were about to head home.  Sunde left through the pharmacy's only door, with Baumgartner and Coker following her.  The women stopped when a man appeared in the doorway wearing a sweatsuit, beanie, sunglasses, white sneakers, and a surgical mask.  The man carried a

2

fabric tote bag and a small handgun. The women retreated inside the pharmacy as the man stepped toward them.

¶3    In a soft voice, the man mumbled, "Percocet 10." When the women did not react, he forcefully repeated, "Percocet 10." Sunde, the only pharmacist working that day, directed Coker to retrieve the Percocet. At this time, the man asked Baumgartner if the pharmacy had an office. She replied that it did not but that it had a bathroom, and he told her to go inside the bathroom and wait. Coker went to the back of the pharmacy, grabbed a bottle of Percocet, and placed it in the man's tote bag. The man thanked Coker and directed Sunde and Coker to wait with Baumgartner in the bathroom for a few minutes. Once inside the bathroom, Coker identified the robber as Grant West—a customer of the pharmacy and her childhood acquaintance. After the women determined that it was safe to leave the bathroom, they locked the pharmacy's door and called 911. Video surveillance showed that the encounter lasted less than one minute.

¶4    Columbia Falls Police Officers Johnson and Stufflebeem responded to the scene within a few minutes. The employees recounted the robbery and, after some prompting, Coker revealed that she believed West committed the robbery. Coker gave Officer Johnson West's address and described his vehicle as a green SUV. Dispatch confirmed West's address and advised that he drove a green 1994 Jeep Cherokee. Super 1's manager arrived to review the surveillance footage with the pharmacy employees and officers. It showed that the robber walked with a limp. This confirmed Coker's belief that West committed the robbery, as he normally relies on a cane to walk.

3

¶5     Officers arrested West at his residence the same night and found a bottle of Percocet 10 in one of his pockets. Law enforcement transported West to the police station where Detective Craig McConnell interviewed him. West adamantly denied that he was involved in the robbery, stating that he was home all night and that he loaned his Jeep to his friend Jimmy who lived in the Half Moon Mobile Home Park. West explained that he could not walk without using a cane because he suffered from chronic back pain and was recently diagnosed with osteonecrosis. He said that his doctor prescribed him Percocet 10 to manage his pain and recently had increased his dose from one to three 10-milligram pills per day after West fractured his femur. Detective McConnell questioned West about a recent incident where West refilled his Percocet prescription roughly two weeks early. West explained that his doctor ordered the refill after West woke up in the middle of the night and knocked his pill bottle off the counter and into the toilet.

¶6     Officers searched West's home and recovered a pair of white and blue Skechers sneakers; several prescription bottles from the Good Medicine Pharmacy; a black, loaded, 9-millimeter Hi-Point handgun with an orange safety; and a right-handed, inside-the-waistband holster. West also had a surgical mask on the front passenger seat of his Jeep. The officers did not find the specific Percocet 10 bottle that the robber stole from the Good Medicine Pharmacy or any other clothing that matched the robber's description. Officers canvassed the Half Moon Mobile Home Park to search for "Jimmy" to no avail.

¶7     On April 15, 2022, the State charged West with one count of robbery (§ 45-5-401(1)(b), MCA), aggravated kidnapping (§ 45-5-303(1)(b), MCA), and criminal possession of dangerous drugs (§ 45-9-102, MCA). Although all three pharmacy

4

employees were present during the robbery, the State charged West with robbing and kidnapping only Sunde. The Eleventh Judicial District Court scheduled West's trial to begin December 19, 2022.

¶8 On December 16, just a few days before trial, the State notified West that Coker had a hearing impairment that rendered her completely deaf in her left ear. West filed a motion to exclude Coker's testimony at trial, alleging that the State violated his due process rights by suppressing exculpatory information. The State explained that it first learned of Coker's impairment during a pretrial interview that was conducted three days earlier. The District Court denied West's motion, remarking that Coker's impairment affected the weight of the evidence and that West could ask about it on cross-examination.

¶9 Several witnesses testified for the State at trial, including the manager of Super 1; Coker, Sunde, and Baumgartner; Officers with the Columbia Falls Police Department and the Flathead County Sheriff's Department; West's brother, Sean; Edwin Kile, the manager of the Half Moon Mobile Home Park; and Robert Windorski, a broker at the Gold Rush Pawn Company. West moved for dismissal after the State rested, arguing that the evidence was insufficient to support a guilty verdict. The District Court denied the motion. West testified in his own defense but did not call any other witnesses. After three days of trial, the jury found West guilty on all counts. The court sentenced West to concurrent terms of 40 years in prison for robbery, 10 years in prison for aggravated kidnapping, and 5 years with the Department of Corrections for criminal drug possession.

**STANDARDS OF REVIEW**

¶10 We conduct a plenary review of constitutional questions, including alleged *Brady* violations. *State v. Ilk*, 2018 MT 186, ¶ 15, 392 Mont. 201, 422 P.3d 1219. We review de novo a district court's denial of a defendant's motion to dismiss for insufficient evidence, a defendant's claims of ineffective assistance of counsel, and a defendant's preserved claims of prosecutorial misconduct. *State v. Swann*, 2007 MT 126, ¶ 19, 337 Mont. 326, 160 P.3d 511; *State v. Clary*, 2012 MT 26, ¶ 12, 364 Mont. 53, 270 P.3d 88; *State v. Dobrowski*, 2016 MT 261, ¶ 8, 385 Mont. 179, 382 P.3d 490. A claim of prosecutorial misconduct raised for the first time on appeal is reviewed for plain error. *State v. Ritesman*, 2018 MT 55, ¶ 12, 390 Mont. 399, 414 P.3d 261.

**DISCUSSION**

¶11 *1. Did the District Court err in denying West's* Brady *motion when the State waited three days to disclose that a witness was hearing impaired?*

¶12 The State violates a defendant's due process rights if it fails to provide the defense with all exculpatory evidence in its possession. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963); *see also State v. Weisbarth*, 2016 MT 214, ¶ 20, 384 Mont. 424, 378 P.3d 1195. A defendant must prove three elements to succeed on a *Brady* claim: "(1) the State possessed evidence, including impeachment evidence, favorable to the defense; (2) the prosecution suppressed the favorable evidence; and (3) had the evidence been disclosed, a reasonable probability exists that the outcome of the proceedings would have been different." *Weisbarth*, ¶ 20 (citing *McGarvey v. State*, 2014 MT 189, ¶ 16, 375 Mont. 495, 329 P.3d 576).

6

¶13    On the Tuesday before West's trial began, during Coker's pretrial interview, the State discovered that Coker was hearing impaired.  The State informed the defense of this development on Friday of the same week.  West filed a motion asking the court to exclude Coker's testimony on the ground that the State's failure to promptly disclose this information constituted a *Brady* violation.  West did not request a continuance of the trial or seek to interview Coker.  The court acknowledged that it was "not sure why it took three days . . . to get [West] that information," but denied the defense's motion, reasoning that Coker's impairment affected the weight of the evidence and that West could inquire about it on cross-examination.  On appeal, West contends that the State's delayed disclosure deprived him of a meaningful opportunity to challenge Coker's credibility.  West argues that he lacked sufficient time to procure a medical expert or request that Coker undergo medical testing.

¶14    We consider evidence that undermines a key state witness's credibility to be "of particular favorability" to the defense.  *State v. Severson*, 2024 MT 76, ¶ 18, 416 Mont. 201, 546 P.3d 765.  A defendant's claim fails, however, if they cannot establish any one of the three *Brady* elements.  *See State v. Fillion*, 2020 MT 283, ¶ 14, 402 Mont. 84, 475 P.3d 725 (declining to address the remaining two *Brady* elements when the defendant failed to establish that the suppressed evidence would have been favorable to the defense).  In the present case, the parties primarily dispute the third element, which is satisfied when the defendant proves a "reasonable probability" that had the State disclosed the evidence, it would have altered the outcome of the proceedings.  *Ilk*, ¶ 37.  In other words, the State's suppression of favorable evidence must "undermine confidence in the verdict."  *Ilk*, ¶ 37

7

(quoting *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S. Ct. 1555, 1566 (1995)). We review the evidence collectively rather than in isolation when determining its materiality. *Severson*, ¶ 29.

¶15 At trial, Coker testified that she identified West as the robber in part because she "recognized [his] voice right away." The record does not establish why the State waited three days before disclosing Coker's hearing impairment to the defense. Once the State disclosed this evidence, West was aware that he could attack Coker's credibility on cross-examination by inquiring about how her impairment may have impacted her ability to accurately identify West's voice. At trial, West's counsel asked Coker about the extent of her impairment and why she did not disclose it earlier. Coker answered that although she was one-hundred-percent deaf in her left ear, she did not think this information was relevant because "[i]t has never bothered me or [a]ffected anything that I have ever done." West's counsel probed, "It's not relevant when it's a voice identification?" Coker answered, "I think—I don't know."

¶16 Although it may have been helpful for the defense to learn about Coker's hearing impairment earlier, we are not persuaded that the State's three-day delay "undermines confidence in the verdict." *Ilk*, ¶ 37. The State notified West of Coker's impairment before trial, and West had the opportunity to attack her credibility on this ground during cross-examination. The State learned of the issue less than a week before trial, and West did not seek a continuance after the disclosure or additional time to interview Coker before trial began. Coker testified that she has been hearing impaired since birth and that her impairment does not impact her daily life. Coker expressed confidence in her identification

8

of West, stating that she was certain that West was the robber. Given Coker's testimony and West's ability to explore the issue on cross-examination, he has failed to prove a reasonable probability that the outcome of the trial would have been different had he learned of Coker's impairment three days earlier. West has failed to establish the third prong of the *Brady* test. We therefore conclude that the District Court did not err in denying West's motion to exclude Coker's testimony.

¶17    *2. Could any rational juror have found beyond a reasonable doubt that the State established the essential elements of robbery?*

¶18    If, at the close of the prosecution's case-in-chief or the close of all the evidence, "the evidence is insufficient to support a finding or verdict of guilty, the court may, on its own motion or on the motion of the defendant, dismiss the action and discharge the defendant." Section 46-16-403, MCA. A defendant is entitled to dismissal only if, viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Swann*, ¶ 16.

¶19    West moved for dismissal after the close of the State's evidence, arguing that, "even given the evidence in the light most favorable to the State . . . a jury could [not] convict [West] of any of these crimes." The court denied West's motion, concluding that "there has been certainly sufficient evidence when viewed in the light most favorable to the State for the jury to actively consider the issue of guilt and innocence, so I'll allow [the jury] to do so." West argues on appeal that the eyewitness accounts and other evidence linking him to the robbery cannot sustain his conviction. The State responds that "overwhelming"

evidence exists to support the conviction and that West improperly requests this Court to reweigh the evidence.

¶20 West develops argument on appeal challenging only his robbery conviction. We therefore analyze only whether, viewing the evidence in the light most favorable to the prosecution, a rational juror could have found the essential elements of robbery beyond a reasonable doubt. *See State v. Hicks*, 2006 MT 71, ¶ 22, 331 Mont. 471, 133 P.3d 206 ("[I]t is not this Court's obligation to conduct legal research on appellant's behalf, to guess as to his precise position, or to develop legal analysis that may lend support to his position." (citation and quotations omitted)).

¶21 An individual commits robbery "if in the course of committing a theft, the person threatens to inflict bodily injury upon any person or purposely or knowingly puts any person in fear of immediate bodily injury." Section 45-5-401(1)(b), MCA. A person commits theft if the person "purposely or knowingly obtains or exerts unauthorized control over property of the owner and has the purpose of depriving the owner of the property." Section 45-6-301(1)(a), MCA. A person acts purposely if "it is the person's conscious object to engage in that conduct or to cause that result" and knowingly if the person is "aware that it is highly probable that the result will be caused by the person's conduct." Section 45-2-101(35), (65), MCA. The court instructed the jury on each of these applicable standards of law and tasked the jury with determining whether West robbed Sunde.

¶22 Coker testified that she had known West for twenty-seven years and that she spoke with him numerous times in the year-and-a-half that he was a patient at the pharmacy. Coker testified that she "recognized Grant's voice right away" when the robbery occurred

10

and that she had seen West wear the same white shoes with blue stitching that the robber was wearing. Coker testified that she was "150 percent" sure that the robber was West when she viewed the surveillance footage and observed that the robber was limping. Sunde similarly testified that she believed West was the robber based on his voice, height, build, and limp. When officers searched West's home, they found white shoes with blue soles and stitching. At trial, the jury was able to compare the shoes recovered from West's home with surveillance footage of the robber's shoes. Officers also recovered a surgical mask from West's car and numerous prescription bottles but did not find the stolen bottle of Percocet 10 or any of the robber's other clothing items.

¶23 All three pharmacy employees described the robber's gun as a black handgun. Coker and Baumgartner testified that they noticed orange markings on the gun near the safety and on top of the gun. Coker testified that the robber held the gun in his right hand. Sunde said that the robber initially held the gun in his left hand but, after Coker left to retrieve the Percocet, he switched the gun to his right hand and pointed it at her. Officers found a loaded, black 9-millimiter Hi-Point handgun with an orange safety and front-rear sights in West's home along with a right-handed holster. The jury heard this testimony and viewed the gun obtained from West's residence. West presented evidence that he was left-handed, and Detective McConnell conceded that people typically hold weapons in their dominant hand. The jury also heard testimony that the black 9-millimeter Hi-Point is a relatively inexpensive and common weapon.

¶24 The jury alone determines witness credibility and assigns weight to the evidence. *State v. McWilliams*, 2008 MT 59, ¶ 37, 341 Mont. 517, 178 P.3d 121. Evidence is not

rendered insufficient to support a guilty verdict simply because witnesses present conflicting testimony. *McWilliams*, ¶ 37. West rebutted the State's theory by presenting evidence that he used Percocet 10 as prescribed and that his leg injury prevented him from committing the robbery. He also argued that the State did not find enough evidence to link him to the crime and failed to disprove his alibi that he lent his Jeep to his friend Jimmy. Edwin Kile testified that he was not aware of a resident named Jimmy at the Half Moon Mobile Park, but that it was possible for a person to live there without his knowledge if they did not sign a formal lease. The jury considered this conflicting evidence and credited the State's version of events.

¶25 Viewing the above evidence in the light most favorable to the State, we conclude that a rational juror could have found beyond a reasonable doubt that West purposely or knowingly deprived the pharmacy of Percocet 10 and, while doing so, put Sunde in fear of immediate bodily injury when he pointed a gun at her. The District Court therefore properly denied West's motion to dismiss for insufficient evidence and allowed the jury to determine the verdict.

¶26 *3. Did the State commit prosecutorial misconduct when it introduced evidence about West's alleged drug addiction and when it presented an overlay of security camera footage during closing argument?*

¶27 The Sixth Amendment to the U.S. Constitution and Article II, Section 24, of the Montana Constitution guarantee criminal defendants the right to a fair trial. *State v. Haithcox*, 2019 MT 201, ¶ 24, 397 Mont. 103, 447 P.3d 452. A prosecutor's misconduct may be grounds for reversal if it deprived the defendant of a fair and impartial trial. *Haithcox*, ¶ 24 (citing *State v. McDonald*, 2013 MT 97, ¶ 10, 369 Mont. 483, 299 P.3d

12

799).  To demonstrate reversible error, a defendant must show that the prosecutor's misconduct prejudiced their substantial rights.  *State v. Mercier*, 2021 MT 12, ¶ 37, 403 Mont. 34, 479 P.3d 967.

¶28  West raises two claims of prosecutorial misconduct—once during the presentation of evidence and once in closing argument.  West first argues that the prosecutor solicited improper character testimony from witnesses to suggest that West robbed the pharmacy because he was a drug addict.  West also alleges that the State improperly used an overlay video of surveillance footage during closing argument to argue that West was the robber.[1] He preserved the latter claim by objecting during trial.

**Testimony Regarding West's Alleged Drug Addiction**

¶29  West alleges that the prosecutor prejudiced his defense by "solicit[ing] opinion testimony strongly implying to the jury West committed the robbery because he was a drug addict."  West challenges Sunde's and Detective McConnell's testimony.  Sunde testified that she was concerned by West's dosage increases and early refills of his Percocet prescription, describing these behaviors as "red flags" of potential abuse.  Detective

---

[1] In this regard, West contends that the District Court erred by admitting the overlay video into evidence without requiring the State to lay the proper foundation required by M. R. Evid. 901. This argument is a mischaracterization of the issue.  The State played the overlay video as an illustrative aid during closing argument, but it did not move for its admission into evidence. *See* Fed. R. Evid. 107 (distinguishing illustrative aids not admitted into evidence from demonstrative exhibits admitted for substantive purposes).  The jury did not receive the video during its deliberation, and the video is not part of the record on appeal.  Nor has West developed an argument under M. R. Evid. 611(a) ("The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence . . . ." *Hicks*, ¶ 22.  We therefore do not address West's argument that the District Court improperly "admitted" the overlay video. *See* Fed. R. Evid. 107 (2024) Advisory Committee Note (explaining that prior to the enactment of Rule 107, courts regulated the use of illustrative aids under Fed. R. Evid. 611(a)).

McConnell testified that West's "pill addiction" and prescriptions contributed to the "overwhelming evidence" that led him to target West as a suspect. West did not object to this testimony at trial; the State thus argues that West failed to preserve this argument for appeal. West acknowledges that he failed to object but nevertheless argues in reply that he is entitled to plain-error review of his conviction.

¶30 Error may not be predicated upon a court's ruling to admit evidence "unless a substantial right of the party is affected and . . . a timely objection or motion to strike appears of record, stating the specific ground of objection." M. R. Evid. 103(a)(1); *State v. Strizich*, 2021 MT 306, ¶ 28, 406 Mont. 391, 499 P.3d 575. If a defendant fails to timely object to an error during trial, the defendant waives the unobjected-to issue on appeal. Section 46-20-104(2), MCA; *State v. Racz*, 2007 MT 244, ¶ 36, 339 Mont. 218, 168 P.3d 685. Because West failed to object to witness testimony about his alleged drug addiction during trial, he has failed to preserve this argument for appeal. We generally do not address unpreserved issues of prosecutorial misconduct. *State v. Lawrence*, 2016 MT 346, ¶ 6, 386 Mont. 86, 385 P.3d 968 (citations omitted). In our discretion, however, we may invoke the plain-error doctrine to review unpreserved issues that "implicate a defendant's fundamental constitutional rights when failing to review the alleged error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process." *State v. Aker*, 2013 MT 253, ¶ 21, 371 Mont. 491, 310 P.3d 506 (quoting *McDonald*, ¶ 8); *see also* M. R. Evid. 103(d).

¶31 We will not invoke plain error where the appellant requests it for the first time in a reply brief. *State v. Beaudet*, 2014 MT 152, ¶ 18, 375 Mont. 295, 326 P.3d 1101. West's opening brief is devoid of any reference to the plain-error doctrine. West requests plain-error review for the first time in his reply brief, conceding that "[the State] correctly notes that [the] plain error doctrine was not explicitly cited in Mr. West's opening brief." Because West failed to object to the witness testimony at issue during trial and failed to timely request plain-error review, he has waived this argument on appeal.

**Overlay of Surveillance Footage Presented During Closing Argument**

¶32 On the first day of trial, the State played surveillance footage of the robber entering Super 1 Foods. The court admitted this video into evidence as Exhibit 4 without objection. Later, the State called Robert Windorski, a pawn broker at the Gold Rush Pawn Company, as a witness. Windorski testified that West was a customer of the pawn shop and that after the robbery, law enforcement asked if he had any surveillance footage of West. The State then played a surveillance video of West walking into the pawn shop on May 9, 2022. The court admitted the pawn shop surveillance video into evidence as Exhibit 46. Again, West did not object.

¶33 Before closing argument and outside of the jury's presence, the State informed the court and the defense that it intended to use an overlay video of the robber entering Super 1 and West entering the pawn shop during closing argument. West objected to the use of the overlay video, arguing that its accuracy could not be verified because "[w]e don't know the technology that was used necessarily, we don't know how it was made, we don't know if the frame rates are the same, if the speed is the same." After watching the video outside

the presence of the jury, the court allowed the State to play it. The court reasoned that it was an overlay of two admitted exhibits and that counsel enjoys leeway during closing argument. The State played the ten-second overlay video six consecutive times during closing, arguing "[l]adies and gentlemen, that's the same person, that's Grant West entering Super 1 before [he] committed the armed robbery, the kidnapping and to take possession of some drugs that he didn't have the right to take, and that's Grant West entering Gold Rush Pawn." West argues on appeal that he was prejudiced by the State's use of the overlay video because the prosecutor improperly testified regarding what the overlay showed without leaving West an opportunity to rebut this allegation.

¶34 We review a prosecutor's alleged improper statements during closing argument in the context of the entire argument to determine whether they prejudiced the defendant's right to a fair trial. *Lawrence*, ¶ 13. West bears the burden of demonstrating that the prosecutor's argument was improper and violated his substantial rights. *Lawrence*, ¶ 13.

¶35 A prosecutor may "comment on the gravity of the crime charged, the volume of the evidence, credibility of witnesses, [and] inferences to be drawn from various phases of evidence." *McDonald*, ¶ 14 (citations and quotations omitted); *see also State v. Miller*, 2022 MT 92, ¶ 22, 408 Mont. 316, 510 P.3d 17 (explaining that the prosecutor may "properly comment on and argue *for any position or conclusion* regarding the nature, quality, or effect of the evidence in relation to the applicable law and the prosecutor's burden of proof" (emphasis in original; citations and quotations omitted)). The prosecution must refrain from offering personal opinions about the guilt of the accused or credibility of

witnesses; but it is permissible to comment on the evidence and suggest inferences that the jury may draw. *McDonald*, ¶ 14 (citations omitted).

¶36 Although the record contains Exhibits 4 and 46, the overlay video was not entered into evidence, and neither party requested that the overlay be marked for identification and entered into the record. The overlay video therefore was not provided as part of the District Court record on appeal. *See* M. R. App. P. 8(1) ("[T]he original papers and exhibits filed in the district court, the transcript of proceedings, if any, and a certified copy of the docket entries prepared by the clerk of the district court shall constitute the record on appeal in all cases."). Our review is confined to the evidence contained in the district court record. *State v. MacKinnon*, 1998 MT 78, ¶ 15, 288 Mont. 329, 957 P.2d 23; *Brunette v. State*, 2016 MT 128, ¶ 16, 383 Mont. 458, 372 P.3d 476 (explaining that we did not consider references to police videos that were not entered into evidence and were therefore not contained in the record on appeal). Because the overlay video was not included in the record on appeal, we must determine whether its use prejudiced West's defense by reviewing the admitted video exhibits and the trial transcript.[2]

---

[2] We do not, as the Dissent contends, reward the State for using "blindsiding tactics of presenting unauthenticated evidence." Dissent, ¶ 12. As discussed, the overlay was not admitted into evidence and West makes his claim as one for prosecutorial misconduct. Our review is constrained to the evidence in the record and determining whether the prosecutor's use of the video and comments during closing argument prejudiced West's substantial rights. *Lawrence*, ¶ 13. This is a high bar, and we must make this determination without resorting to speculation about the video. *See* 2 Kenneth S. Broun et al., *McCormick on Evid.* § 214 (9th ed. 2025) (explaining that when an illustrative aid is not made part of the record, "many courts have presumed that the illustrative items and testimony referring to them support the verdict, making it in the interest of both parties to clarify the record"). We note that parties are not helpless in these circumstances but—if they wish to preserve their record on appeal—must ask the trial court to put the illustrative aid in the record for review. *See* Fed. R. Evid. 107(c) (requiring that "[w]hen practicable, an illustrative aid used at trial must be entered into the record"); M. R. App. P. 8(2).

¶37 Having viewed the videos that were admitted and the transcripts provided, we are not convinced that the prosecutor improperly argued that both surveillance videos showed West. The prosecutor explained that the overlay consisted of "the same videos that have been admitted into evidence" and that the State had not changed the rate of the exhibits. The District Judge, unlike this Court, had the opportunity to view the video prior to closing argument and determined that it was an overlay of the admitted exhibits. Prior to closing arguments, the District Court instructed the jury that it was not to consider the attorneys' "presentation itself evidence, it's simply argument." The court's cautionary instruction reduced any risk of prejudice from the video.

¶38 The prosecutor did not offer his personal opinion that the overlay depicted West but rather suggested an inference that the jury could draw from two properly admitted video exhibits and the testimony presented. Moreover, West argued in rebuttal of the prosecutor's allegation that the overlay depicted the same person. During closing, defense counsel consecutively played Exhibits 4 and 46 for the jury, argued that West's gait was different from the robber's, and stated that the jury had to find West not guilty if they had "any doubt" that the videos showed different people. We cannot conclude on this record that the video was a "misleading presentation" of the evidence that was admitted without objection. Dissent, ¶ 7.

¶39 The Dissent, ¶ 9, is correct that counsel may not use closing argument to reference evidence not admitted in the record or to put on a demonstration that effectively introduces new evidence. *See Rieger v. Coldwell*, 254 Mont. 507, 510, 839 P.2d 1257, 1258-59 (1992). But it is appropriate for counsel to comment on properly admitted evidence

18

during closing argument, and the jury may make inferences from such evidence. *Moralli v. Lake Cnty.*, 255 Mont. 23, 32, 839 P.2d 1287, 1293 (1989). The District Court admitted Exhibits 4 and 46 into the record without objection, and the prosecutor presented evidence that both videos depicted an individual with a distinctive limp. This case is not like *Rieger*, where counsel crushed sheetrock in his hand to demonstrate that it was defective but failed to introduce evidence on this point during trial. *See Rieger*, 254 Mont. at 510, 839 P.2d at 1259. The State presented and commented on an overlay of two admitted videos and witness testimony; its argument did not introduce new evidence.

¶40 From our review of the trial transcript and the admitted evidence, we conclude that West has not met his burden of demonstrating that the State's use of the overlay video violated his substantial rights. *See Lawrence*, ¶ 13; § 46-20-701(1), MCA. The prosecutor's conduct did not deprive West of a fair trial, and he is not entitled to reversal of his conviction on this ground.

¶41 *4. Did West receive ineffective assistance of counsel?*

¶42 The United States and Montana Constitutions guarantee defendants the right to effective assistance of counsel. Mont. Const. art. II, § 24; U.S. Const. amend. VI; *State v. Wright*, 2021 MT 239, ¶ 9, 405 Mont. 383, 495 P.3d 435. To succeed on an ineffective assistance of counsel claim, a defendant must prove "(1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defense." *State v. Ward*, 2020 MT 36, ¶ 18, 399 Mont. 16, 457 P.3d 955 (citations omitted).

¶43 West claims that his trial counsel was ineffective because counsel "missed many errors and did not present argument in support of his objections or actively confront

19

witnesses with their previous inconsistent statements." West alleges that his trial counsel failed to object to law enforcement's "improper" eyewitness interviews or move to exclude the pharmacy employees' testimony on this ground, failed to develop witness testimony about West's left-handedness or the existence of Jimmy's fingerprints in his vehicle, failed to object to "unqualified opinion testimony" regarding West's drug use, and failed to adequately argue the presumption of innocence or the State's burden of proof. The State responds that West's claims are inappropriate for review on direct appeal but that if this Court does review them, West has failed to demonstrate that counsel's performance was deficient or that he suffered prejudice.

¶44     Before analyzing the merits of a defendant's ineffective assistance of counsel claim, we must determine whether the record supports review on direct appeal or whether the claim is more suited for review in a petition for postconviction relief. *Ward*, ¶ 18. We may review a claim of ineffective assistance of counsel on direct appeal when the record answers why counsel did or did not take a particular course of action or when "no plausible justification" exists for trial counsel's acts or omissions. *State v. Hinshaw*, 2018 MT 49, ¶ 21, 390 Mont. 372. 414 P.3d 271; *Wright*, ¶ 10 (quoting *State v. Kougl*, 2004 MT 243, ¶ 15, 323 Mont. 6, 97 P.3d 1095). If counsel's reasoning is not apparent from the face of the record, however, a defendant's claim is properly reviewed in a postconviction proceeding where the record may be developed further. *Hinshaw*, ¶ 21; *State v. Sartain*, 2010 MT 213, ¶ 30, 357 Mont. 483, 241 P.3d 1032.

¶45     Claims based on trial counsel's alleged omissions frequently are ill-suited for direct appeal because an omission "indicates that non-record based information explains trial

counsel's decisions." *State v. Meyers*, 2007 MT 230, ¶ 10, 339 Mont. 160, 168 P.3d 645. We have declined to review a defendant's claim that stemmed from counsel's failure to object to and seek exclusion of improper witness testimony. *Meyers*, ¶ 11; *see also Sartain*, ¶ 31 (concluding that defendant's claims involving counsel's failure to object to the admission of evidence or the prosecutor's allegedly improper remarks were not appropriate for direct appeal); *Ward*, ¶¶ 19, 21-22 (explaining that because we could only speculate why defense counsel failed to object to improper witness testimony, the defendant's claim was not record-based).

¶46 West's ineffective assistance of counsel claims are based on several omissions that he alleges prejudiced his defense. The record does not explain why West's counsel chose not to pursue exclusion of Coker's, Baumgartner's, and Sunde's testimony on the ground that law enforcement failed to separate them during their initial conversation with police. The record also does not demonstrate why counsel failed to object to witness testimony about West's alleged drug addiction or why counsel did not pursue certain trial strategies. Counsel may have had a plausible justification for these decisions, including "believing the grounds for the objection were meritless or were capable of being effectively discredited on cross-examination." *Sartain*, ¶ 31. For example, West's counsel did question Officer Johnson and Detective Stoll about their failure to separate the pharmacy employees and whether this was a proper procedure. Ultimately though, because we can only speculate as to defense counsel's reasoning behind failing to object to witness testimony and abstaining from certain trial strategies, we conclude that West's ineffective assistance of counsel claims are not record-based. We therefore do not review these claims on direct appeal.

21

¶47    *5. Did the alleged cumulative errors deprive West of a fair trial?*

¶48    West lastly alleges that his conviction should be reversed under the cumulative error doctrine. In rare cases, this Court may reverse a defendant's conviction "where numerous errors, when taken together, have prejudiced the defendant's right to a fair trial." *State v. Cunningham*, 2018 MT 56, ¶ 32, 390 Mont. 408, 414 P.3d 289 (quoting *State v. Hardman*, 2012 MT 70, ¶ 35, 364 Mont. 361, 276 P.3d 839); *Lawrence*, ¶ 27 (Baker, J., concurring). When the defendant fails to establish error, however, the cumulative error doctrine does not apply. *See State v. Ellerbee*, 2019 MT 37, ¶ 43, 394 Mont. 289, 434 P.3d 910; *Hardman*, ¶ 35. As discussed, West has failed to establish error or resulting prejudice. The cumulative error doctrine is therefore inapplicable.

## CONCLUSION

¶49    The District Court correctly denied West's *Brady* motion as well as his motion to dismiss the State's case for insufficient evidence. West has not met his burden of demonstrating that the prosecutor's misconduct prejudiced his defense, and his ineffective assistance of counsel claims are not appropriate for review on direct appeal. We therefore affirm West's conviction.

/S/ BETH BAKER

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE

22

Justice Ingrid Gustafson, dissenting.

¶50    I dissent to the Court's findings and conclusion as to issue three.

¶51    The Court today affirms West's conviction despite the State's use of an unauthenticated, digitally altered composite video shown for the first time during closing argument—an exhibit shown repeatedly to the jury without any foundational testimony, without any opportunity for the defendant to rebut its accuracy, and without any assurance that the exhibit fairly represented the underlying evidence. The majority excuses this error by characterizing the composite video as a mere "demonstrative exhibit" and by noting that it is not included in the appellate record. In my view, these rationales are inconsistent with Montana's Rules of Evidence and with our precedent requiring a fair trial.

¶52    The composite video was not authenticated and should not have been shown to the jury. Montana law requires that evidence be authenticated by "evidence sufficient to support a finding that the matter in question is what its proponent claims." M. R. Evid. 901(a). Authentication of photos and videos is typically done through testimony that the evidence is a fair and accurate representation of what it purports to depict. Where a picture or video has been altered, enhanced, or compiled, courts require additional foundation demonstrating the editing process did not distort or misrepresent the underlying evidence. *See State v. Warwick*, 158 Mont. 531, 538-44, 494 P.2d 627, 631-33 (1972) (admission of transcription of audio recording of defendant's statement without the audio recording requires foundation establishing its authenticity, correctness, and that changes, additions, or deletions have not been made and the failure to authenticate defendant's transcribed statement resulted in its inadmissibility and reversal of defendant's conviction); *City of*

23

*Missoula v. Forest*, 236 Mont. 129, 134-36, 769 P.2d 699, 702-03 (1989) (determining the foundational requirements of *Warwick* were met and properly admitting DUI video).

¶53 M. R. Evid. 901 applies to all evidence—including demonstrative evidence. A composite video created by overlaying two separate videos is not a mere playback of admitted evidence—it is a new exhibit that must be authenticated. To properly understand that the composite video depicts what it is purported to depict, foundational evidence must be presented to assure the editing process did not distort or misrepresent the underlying evidence. In pertinent part, Rule 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

¶54 In general, demonstrative evidence contrasts from real evidence in that it has no probative value itself but is used as a teaching or pedagogic device to assist a jury in comprehending the testimony of a witness or other admitted evidence.[1] Thus, demonstrative evidence may be presented to a jury to assist it in comprehending other

---

[1] On December 1, 2024, the Federal Rules of Evidence were amended to specifically distinguish the use of "illustrative aids" (not admitted into evidence but used only to assist the trier of fact in understanding other evidence) and "demonstrative evidence" (admitted into evidence and used substantively to prove disputed issues at trial). By way of citation to Fed. R. Evid. 107, the majority refuses to contend with the actual issue in this case, determining the State's created video of unknown providence is an "illustrative aid" and therefore it will "not address West's argument that the District Court improperly 'admitted' the overlay video" under M. R. Evid. 901. Opinion, ¶ 28 n.1. Montana does not have a counterpoint rule to Fed. R. Evid. 107. *Compare* Fed. R. Evid. 107 (which exists) *with* M. R. Evid. 107 (which does not). If Montana did have such a rule, the "illustrative aid" would be required to be placed in the record because when practicable, "an illustrative aid used at trial must be entered into the record." Fed. R. Evid. 107(c). But in any event, West's appeal does not turn on semantic games of whether the video was "admitted," but the very real situation in which the State's created and unauthenticated video was actually shown to the jury.

evidence so long as proper foundation is laid (Rule 901 requirement) and it does not create the danger of unfair prejudice, confusion of the issues, or misleading the jury (Rule 403 requirements). A witness may use exhibits for demonstrative purposes, provided the proper foundation for each exhibit has been laid, the opposing party has an opportunity to review the demonstrative exhibits and cross-examine the witness on the demonstrative exhibits, and the court gives a limiting instruction. *See United States v. Olano*, 62 F.3d 1180, 1204 (9th Cir. 1995). Foundation for demonstrative evidence rests on the witness's familiarity with the accuracy of photographs/videos or an expert's familiarity with the apparatus used for simulation or recreation of the item, process, procedure, or event in question. As demonstrative evidence itself has no probative value, its "probative value" cannot be weighed against the dangers noted in Rule 403—danger of unfair prejudice, confusion of the issues, or misleading the jury. If demonstrative evidence involves risk of prejudice, confusion of the issues, or risks misleading the jury, it should not be allowed to be presented to the jury.

¶55 During trial, the State presented two surveillance videos of a person walking into a business (Super 1 Foods and Gold Rush Pawn) and asserted each showed West. The foundation for the admission of those videos was separately laid by an employee testifying to obtaining the footage from their security camera system and confirming the footage to be played was an accurate copy of what they had obtained. Each video was then played to the jury, where each video essentially served as a "silent witness":

> Historically, photographic evidence was admitted as demonstrative evidence. Such evidence had no significance apart from the ability to illustrate something testified to by a witness. Most jurisdictions now allow

25

photographs and videotapes to be introduced as substantive evidence so long as a proper foundation is laid. Such evidence is generally admitted under the "silent witness" theory. Under this theory, a witness need not testify to the accuracy of the image depicted in the photographic or videotape evidence if the accuracy of the process that produced the evidence is established with an adequate foundation. In such a case, the evidence is received as a so-called silent witness or as a witness which speaks for itself.

*People v. Taylor*, 2011 IL 110067, ¶ 32, 956 N.E.2d 431 (internal citations and quotation marks omitted). The surveillance videos (particularly those from Super 1) were offered as substantive evidence during trial.

Evidence offered for substantive purposes acts as a silent-witness as to what activity is being depicted whereas evidence offered for demonstrative purposes is merely an aid that assists in a human witness's testimony. When videos or photographs are admitted as substantive evidence, the foundational requirements are vastly different from the foundational requirements for demonstrative evidence. The foundation for videos or photographs as demonstrative evidence requires testimony that the evidence accurately depicts the scene or occurrence as it appeared at the time in question. The foundation for the admission of videos or photographs as substantive evidence requires a strong showing of authenticity and competency, including proof that the evidence was not altered.

*Irwin v. State*, 229 N.E.3d 567, 571 (Ind. Ct. App. 2024) (internal citations omitted; cleaned up). But by the time of closing arguments, the State sought to play an altered video it had apparently created which it contended was a demonstrative exhibit that showed a composite overlay of the two previously-admitted surveillance videos.

¶56 A composite overlay—especially one created outside of the courtroom—carries an aura of technical precision. When the State displayed it six times during closing argument, the jury was invited to believe the video "proved" West was the offender. Because the composite was never authenticated, the court could not determine whether the timing was accurate, the angles were aligned, the overlay distorted objects or perspective, or whether

26

the exhibit created an impression not present in either original video. This is precisely the type of misleading presentation Rule 403 forbids.

¶57 Here, the State offered no witness to explain how the new composite video exhibit was created, what software or technology was used, whether the two videos were synchronized accurately, whether any frames were added or removed, or whether the overlay fairly and accurately represented the underlying recordings. Without authentication and determination that it was not prejudicial, confusing, or misleading, it should not have been presented to the jury even once—let alone six times. And while no member of this Court has ever seen the purported composite video, because as a "demonstrative exhibit" it was not made a part of the record, the District Court was apparently confused after watching the video when ruling on West's objection:

> THE COURT: Why don't you just tell me what it's going to depict?
>
> MR. DONOVAN: You could watch it, Judge.
>
> THE COURT: How long is it?
>
> MR. DONOVAN: It's ten seconds, but I'm going to play it six times. So it's the same clip I'm going to play six times.
>
> THE COURT: You're going to play it six times?
>
> MR. DONOVAN: Yes, Judge. It's playing right now for the [c]ourt.
>
> (Video played.)
>
> THE COURT: And what is overlaid? I mean I see -- that's when he initially came through the door of Super 1, correct?

Despite this confusion, the District Court admitted the video because "we give counsel on both sides quite a bit of leeway when they're presenting argument[.]"

27

¶58 The State's use of the composite video for the first time during its closing argument was improper and prejudicial. The State did not admit the video through any witness, but instead played it for the first time during its closing argument, and then played it six times. This tactic deprived West of any meaningful opportunity to challenge the exhibit's accuracy, cross-examine a witness about its creation, or present rebuttal evidence. Montana law prohibits the introduction of new evidence during closing argument. *Covey v. Brishka*, 2019 MT 164, ¶ 54, 396 Mont. 362, 445 P.3d 785; *Rieger v. Coldwell*, 254 Mont. 507, 510, 839 P.2d 1257, 1259 (1992) (determining defendant's demonstration during closing constituted introduction of new evidence requiring reversal for a new trial).

¶59 Here, the composite video was not admitted into evidence. It was not authenticated. It was not subject to cross examination. The State used an unauthenticated, digitally altered exhibit—shown six times—to visually assert West was the robber. That is not argument— or comment or inference on the evidence as suggested by the majority—it is evidence masquerading as argument or inference. And, contrary to the majority's extraordinary claim that the prosecutor "did not offer his personal opinion that the overlay depicted West," Opinion, ¶ 38, the prosecutor explicitly did make that claim, immediately following the presentation of the State's created overly video (six times) by telling the jury, "Ladies and gentlemen, that's the same person, that's Grant West entering Super 1 before [he] committed the armed robbery, the kidnapping and to take possession of some drugs that he didn't have the right to take, and that's Grant West entering Gold Rush Pawn." The prosecutor was not commenting on the properly admitted videos at that point, he

specifically made the claim that the State's unauthenticated and digitally altered overlay video showed the same person—West.

¶60    The majority's notion that since the overlay video was not admitted into evidence and is not in the record, combined with the fact that upon closing West played the two original videos actually admitted into evidence and argued that his gait was different from that of the robber and did not again assert the overlay was unreliable or inaccurate—an objection that West previously made which was overruled—West failed to demonstrate the overlay video violated his substantial rights, is absurd.  As the State first unveiled the composite video during its closing, West had no opportunity to voir dire the exhibit, no opportunity to cross-examine a witness about its creation, no opportunity to present rebuttal evidence, and no opportunity to request a limiting instruction.  This violates fundamental fairness.  The majority's note that the "District Judge, unlike this Court, had the opportunity to view the video prior to closing argument and determined that it was an overlay of the admitted exhibits," Opinion, ¶ 37, highlights West's lack of a meaningful appeal.  The exact problem presented here is that this Court has never seen the video at issue and yet we are determining its use did not prejudice West's substantial rights.  While warning against resorting to speculation, the majority itself is rendering an opinion on the merits of the State's unauthenticated, digitally altered video based on speculation and conjecture as to the impact of such video.  This is inappropriate.  *See State ex rel. State Highway Comm'n v. Hill*, 373 S.W.2d 666, 668, 671 (Mo. Ct. App. 1963).  The majority's suggestion that West could rebut the composite video by referencing the two admitted videos ignores the reality that the composite video purported to synchronize and overlay those videos in a way

29

West could not replicate or challenge in his closing. West objected to the "demonstrative exhibit" precisely because it was never authenticated and he had no way of knowing if the overlay video was unreliable or inaccurate:

> MR. WENZ: Yes, Your Honor, we do object to that video. My understanding it was made by somebody in the County Attorney's Office. We don't know the technology that was used necessarily, we don't know how it was made, we don't know if the frame rates are the same, if the speed is the same. There's different angles. I don't know if it accurately depicts anything. So we would object based on the fact that we don't know exactly what is showing --

> . . .

> MR. WENZ: Your Honor, I mean they're different angles, they're different sizes of the individual, one's closer than the other the State can play each one separately to the jury but I think this would be inappropriate to show the jury because it's not the same.

¶61 Finally, the majority's reliance on the composite video not being in the record is misplaced. The majority emphasizes that the composite video is not part of the appellate record and therefore cannot be reviewed. In support of this contention, the majority inaccurately explains Fed. R. Evid. 107, asserting litigants who object to illustrative aids "must ask the trial court to put the illustrative aid in the record for review." Opinion, ¶ 36 n.2. Fed. R. Evid. 107 explicitly states that, when practicable, "an illustrative aid used at trial *must* be entered into the record." Fed. R. Evid. 107(c) (emphasis added).[2] "Must" is

---

[2] The majority also cites to a treatise, *McCormick on Evidence*, for its contention that courts presume an illustrative aid not made part of the record supports the verdict. Opinion, ¶ 36 n.2. The section of that treatise cited to by the majority explicitly notes that the illustrative aids to which it refers are "duplicates, models, hand-drawn maps, charts, drawings, diagrams, and computer-generated pedagogic aids." 2 Kenneth S. Broun et al., *McCormick on Evidence* § 214 (9th ed. 2025). The section also notes that the theory justifying the admission of an illustrative aid "is that the item is a fair and accurate representation of relevant testimony or documentary evidence otherwise admitted in the case. Typically, through testimony, a witness will identify an aid as a

a mandatory term, *State v. Kortan*, 2022 MT 204, ¶ 21, 410 Mont. 336, 518 P.3d 1283, not one which relies on an objecting party to plead with a court to place material used by the other party into the record for possible appellate review. But, in any event, the absence of the exhibit is itself a reason to find error, not a reason to affirm fundamental unfairness. The majority's approach rewards the State for using a blindsiding tactic of presenting unauthenticated new evidence in a manner that avoids its challenge and leaves the defendant without meaningful appellate review. The majority is placing the blame of an insufficient record at the feet of West, asserting we cannot determine whether the use of the composite overlay video prejudiced his defense because the video itself is not in the record, while ignoring that it is not part of the record through no fault of West—who objected to the exhibit and beyond making objection had no meaningful way to assure the District Court made it a part of the record. The video is only not in the record because the State made a tactical decision to surprise West with its newly-created video during closing argument and claimed it was a "demonstrative" exhibit—one which is not made a part of

---

substantially correct representation of something the witness once perceived and is now describing. This satisfies the sufficiency standard of Federal Rule 901(b)(1)[.]" 2 Broun § 214. Here, the majority has determined to completely ignore the sufficiency standard of M. R. Evid. 901. The treatise also succinctly describes the troubles occasioned by the practice of introducing such "illustrative aids" prior to the introduction of Fed. R. Evid. 107: "It, unfortunately, has been common for many illustrative aids to be displayed and referred to without ever being formally offered or admitted into evidence. Appellate courts have commented upon the difficulties created on appeal when crucial testimony has been given in the form of indecipherable references to an object not available to the reviewing court. The clearly preferable practice is for the proponent to offer an illustrative aid into evidence as an exhibit, to authenticate it by the testimony of a witness, and to formally introduce it as part of the witness's testimony, in which it will be incorporated by reference." 2 Broun § 214 (internal footnotes omitted). Here, the State presented its unauthenticated, digitally altered video not during the testimony of a witness, but during its own closing argument.

31

the record. How then could West present us with a "sufficient" record which contains the video? He simply couldn't, and his right to a meaningful appeal on this issue is no more than a mirage. This is incompatible with Montana's standards for fair trial procedure and meaningful appeal.

¶62 The majority invites litigants to create new unreliable evidence outside of the courtroom, unveil it during closing under the guise of merely being argument or "demonstrative," and then precludes meaningful appeal when the district court is wrongly swayed to permit its presentation to the jury. This is contradictory to Montana's Rules of Evidence and with the fundamental right to a fair trial.

¶63 I would reverse on this issue and remand for a new trial.

/S/ INGRID GUSTAFSON


Justices Laurie McKinnon and Katherine M. Bidegaray join in the dissenting Opinion of Justice Ingrid Gustafson.


/S/ KATHERINE M. BIDEGARAY
/S/ LAURIE McKINNON